Phillip HANCOCK, Petitioner–
Appellant,

v.

Anita TRAMMELL, Warden, Oklahoma State Penitentiary, Respondent–Appellee.

No. 12–6255.

United States Court of Appeals,
Tenth Circuit.

Aug. 18, 2015.

Madeline S. Cohen, Office of the Federal Public Defender, Denver, CO (Lanita Henricksen, Henricksen & Henricksen, Lawyers, Inc., Oklahoma City, OK, and David B. Autry, Oklahoma City, OK, with her on the briefs), for Petitioner–Appellant.

Jennifer L. Crabb, Office of the Attorney General for the State of Oklahoma, Oklahoma City, OK, for Respondent–Appellee.

Before LUCERO, MATHESON, and BACHARACH, Circuit Judges.

BACHARACH, Circuit Judge.

In April 2001, Mr. Bob Jett hosted two men: Mr. Phillip Hancock and Mr. James Lynch. An angry altercation ensued, where Mr. Jett tried to force Mr. Hancock into a cage while swinging at him with a metal bar. Mr. Hancock was able to obtain Mr. Jett's gun and use it to shoot Mr. Jett and Mr. Lynch. The two men died, and the State of Oklahoma charged Mr. Hancock with two counts of first-degree murder. Mr. Hancock admitted that he had killed both men, but asserted self-defense. The jury rejected the defense and found Mr. Hancock guilty on both

counts of first-degree murder.[1] *See* Okla. Stat. tit. 21, § 701.7(A) (2001). For these murders, the state district court sentenced Mr. Hancock to death. Mr. Hancock unsuccessfully sought relief on direct appeal to the Oklahoma Court of Criminal Appeals ("OCCA") and in post-conviction proceedings.

Mr. Hancock then turned to federal district court, seeking a writ of habeas corpus. The court denied relief, and Mr. Hancock has appealed. We affirm.

## I. The Issues on Appeal

Four issues have been certified for appeal.

The first issue involves an evidentiary ruling. In this ruling, the state district court allowed the prosecution to elicit evidence that Mr. Hancock had been convicted of manslaughter after successfully claiming self-defense for an unrelated killing. Mr. Hancock claims that introduction of this evidence resulted in a deprivation of due process. The OCCA rejected this claim on the merits, and Mr. Hancock contends that the OCCA unreasonably determined the facts by misstating the basis for the state district court's evidentiary ruling. On appeal, we must decide: Did Mr. Hancock show reliance on an unreasonable determination of facts? We conclude that Mr. Hancock has not met his burden because the OCCA's opinion can reasonably be read as factually accurate. As a result, Mr. Hancock has not shown that the OCCA unreasonably determined the facts, preventing us from deciding the merits of the due process claim.

The second issue is whether the state district court misled the jury by giving unwarranted instructions on self-defense and allowing the prosecutor to make misleading arguments in closing. The court gave uniform instructions on self-defense, which addressed identification of the aggressor and provided that the right to self-defense could be unavailable if the victim initiated the altercation but then withdrew. On appeal, the OCCA held that the instructions were supported by the evidence and that the prosecutor's arguments were proper. We ask: Did these holdings constitute an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts? We conclude that the OCCA reasonably applied Supreme Court precedents and determined the facts. As a result, we cannot reach the merits of the claim.

Third, Mr. Hancock alleges that his trial counsel was constitutionally ineffective for failing to request a jury instruction on the lesser-included offense of manslaughter while resisting a criminal attempt. The OCCA rejected this claim based on a lack of prejudice. We are asked: Did the OCCA unreasonably apply Supreme Court precedent in concluding that defense counsel's alleged error was not prejudicial? We conclude the OCCA did not act unreasonably, for fair-minded jurists could conclude that defense counsel's theory of manslaughter fit the evidence just as well as manslaughter while resisting a criminal attempt. Thus, we cannot reach the merits of the ineffectiveness claim.

Finally, Mr. Hancock alleges cumulative error. We must decide: Can Mr. Hancock obtain habeas relief based on cumulative

---

**1.** Mr. Hancock was also charged with (1) being a felon in possession of a firearm and (2) pointing a firearm at a person (Ms. Shawn Tarp). On the first charge, Mr. Hancock was convicted, but this conviction was reversed on appeal. *Hancock v. State,* 155 P.3d 796, 826 (Okla.Crim.App.2007). In addition to this reversal, Mr. Hancock obtained an acquittal on the charge that he had pointed a firearm at another person. Thus, these charges are not involved in this habeas appeal.

error when the district court did not commit two or more constitutional violations? We conclude that Mr. Hancock is not entitled to habeas relief based on cumulative error. This protection is triggered only when there are two or more constitutional violations. There were not two or more constitutional violations in this case.

Mr. Hancock has moved to expand the certificate of appealability for four other issues: (1) Was the evidence insufficient for the conviction on first-degree murder? (2) Was trial counsel ineffective for failing to effectively impeach the state's witness, Ms. Shawn Tarp, with her previous statements (and was appellate counsel ineffective for failing to claim ineffective assistance of trial counsel)? (3) Did the state district court deny Mr. Hancock the right to present a defense by excluding evidence that would have supported a finding of self-defense? (4) Was the evidence insufficient to support the aggravating circumstance of a murder that was especially heinous, atrocious, or cruel? Appellant's Am. Mot. to Expand the Cert. of Appealability at 2–3 (filed Dec. 19, 2012). We deny the motion to expand the certificate of appealability on these issues.

## II. From a Pack of Cigarettes to Two Dead Men

Mr. Hancock killed Mr. Jett and Mr. Lynch at Mr. Jett's Oklahoma home in April 2001.

### A. Mr. Hancock

In 2001, Mr. Hancock lived with his girlfriend, Ms. Kathy Wiggins. The couple broke up, and Ms. Wiggins used drugs at Mr. Jett's house and stayed on his couch.

### B. Visit to Mr. Jett's Home

Two days after the break-up, Mr. Hancock was allegedly told to bring Ms. Wiggins home because she was acting strangely. Mr. Hancock complied, going to Mr. Jett's home to pick up Ms. Wiggins. When Mr. Hancock arrived, only two people were there: Mr. Jett and a friend, Mr. James Lynch. Both were in Mr. Jett's "Harley Room," a small room where Mr. Jett kept his Harley–Davidson motorcycle. Mr. Jett was working on his motorcycle while Mr. Lynch sat and watched.

According to Mr. Hancock, he entered the home through the front door, which led into Mr. Jett's living room. Upon entering, Mr. Hancock noticed an unopened pack of cigarettes and asked if he could have a cigarette; Mr. Jett responded "yeah." *Id.* at 211. Mr. Hancock opened the pack, took a cigarette, and joined the two men in the Harley Room while waiting for Ms. Wiggins to return.

### C. Threat from Mr. Jett

After Mr. Hancock entered the Harley Room, Mr. Jett allegedly asked Mr. Hancock: "Did you just walk in my house yesterday?" *Id.* at 212. Mr. Hancock responded that he had done so to retrieve his cell phone from Ms. Wiggins, who had spent the night on Mr. Jett's couch. Mr. Hancock allegedly assured Mr. Jett that he had not meant to cause problems and had only entered the home after hearing "someone say 'come in.'" *Id.* at 212.

Mr. Jett told Mr. Hancock that he ought to put him in the empty animal cage in the Harley Room. Mr. Hancock testified that the comment had "caught [him] off guard." *Id.*

### D. Ms. Shawn Tarp

Another friend of Mr. Jett's (Ms. Shawn Tarp) arrived after Mr. Hancock. According to Ms. Tarp, she entered and saw Mr. Lynch sitting in a living-room chair, Mr. Jett working on his motorcycle in the Harley Room, and Mr. Hancock sitting nearby.

According to Mr. Hancock, the four individuals gathered around the living room coffee table and used methamphetamine.

### E. Alleged Tension Between Mr. Hancock and Mr. Jett

After the group took drugs, Mr. Jett and Mr. Hancock returned to the Harley Room while Mr. Lynch and Ms. Tarp remained in the living room. Although in different rooms, the four individuals continued to talk. During the talk, two incidents led Ms. Tarp to believe there was agitation between Mr. Jett and Mr. Hancock.

The first incident involved glasses lying on Mr. Jett's table. Mr. Hancock saw the glasses and told Mr. Jett that they were Ms. Wiggins'; Mr. Jett insisted they were his.

The second incident involved a comment by Mr. Hancock, stating: "I should just shut the f* * * up, I'm here to try to be friends." Trial Tr., vol. VI, at 163. To Ms. Tarp, Mr. Hancock's comment indicated that the two men had experienced a "falling out." Id.

### F. "Get in the Cage"

The agitation grew as Mr. Jett continued to work on his motorcycle. According to Ms. Tarp, Mr. Jett grew frustrated. At one point, Mr. Jett "threw his hands up" and announced that he was leaving to run an errand. Id. at 162–63. Mr. Jett then went to retrieve his shoes and vest from his bedroom.

While Mr. Jett gathered his things, Mr. Hancock moved to a seat in the living room. Mr. Lynch was then sitting on the living-room floor, sorting motorcycle parts.

Mr. Jett loaded a pistol and holstered it in his pants. According to Mr. Hancock, Ms. Tarp asked Mr. Jett if he had everything for his errand and Mr. Jett replied that he needed cigarettes.

Picking up the pack of cigarettes, Mr. Jett noticed it had been opened. He glared at Mr. Hancock and asked: "Did you open this pack of cigarettes?" Trial Tr., vol. VII, at 216. Mr. Hancock said he had, but only because Mr. Jett had given permission. Mr. Jett replied: "I must have five or six packs opened around here." Id. at 217.

Mr. Jett became angry with Mr. Hancock, taking off his vest, throwing it on the floor, and standing over Mr. Hancock with a metal bar in his hand while shouting: "That's it, get—mother f* * *er, get in the cage." Id.; see Trial Tr., vol. VI, at 177 ("[G]et in the f* * *ing cage.").

### G. The Altercation and the Shootings

What happened next is disputed. Three people testified about the altercation and the shootings: Ms. Tarp, Mr. Hancock, and Mr. Jett's neighbor (Mr. Donald Jones).

#### 1. Ms. Tarp's Version

According to Ms. Tarp, Mr. Jett swung the metal bar at Mr. Hancock's head. Ms. Tarp added that she did not know "if [Mr. Jett had] hit [Mr. Hancock] on the side of the head or if he [had] just c[o]me close to it." Id. at 177.

Mr. Jett stopped his assault on Mr. Hancock and stepped "back towards the coffee table," which was in the direction of the front door. Id. at 180. Ms. Tarp did not recall whether Mr. Jett had held onto the metal bar as he stepped away from Mr. Hancock.

At that point, Mr. Hancock "jumped up and attacked [Mr. Jett]," which caused the coffee table and its contents to "[go] flying." Id. at 18081. Ms. Tarp then went

into Mr. Jett's bedroom, where she saw Mr. Jett and Mr. Hancock fighting in the living room.

After watching the fight for a few seconds, Ms. Tarp retreated to a hallway. While standing in the hallway, Ms. Tarp heard three gunshots. After the third shot, she saw Mr. Jett running toward the back door through the Harley Room and kitchen. As Mr. Jett was running, he said "I took one." *Id.* at 183.

Ms. Tarp then heard a fourth gunshot coming from the living room. At that point, Ms. Tarp went into the back bedroom and hid below a window overlooking the backyard.

While hiding, Ms. Tarp heard three more gunshots from the direction of the living room. After the third shot, she heard what sounded like a person falling. She assumed Mr. Lynch had fallen as he tried to intervene.

Shortly after Mr. Lynch fell, Ms. Tarp heard Mr. Hancock running through the Harley Room and kitchen and out the back door. Ms. Tarp assumed that Mr. Hancock was pursuing Mr. Jett, testifying that Mr. Hancock had chased Mr. Jett "like a dog." *Id.* at 185.

From her hiding place, Ms. Tarp heard Mr. Jett go out the back door and fall. When Mr. Hancock came out the back door, Ms. Tarp heard Mr. Jett say "I'm going to die." *Id.* at 185. Mr. Hancock responded "[y]es, you are" and shot Mr. Jett two more times. *Id.*

#### 2. Mr. Hancock's Version

Mr. Hancock recalled the events differently, testifying that (1) he had been hit by the metal bar and (2) Mr. Jett reached for the gun holstered in his belt.

Mr. Hancock believed his life was in danger and tried to take the gun from Mr. Jett. When Mr. Hancock reacted, Mr. Lynch rose from the floor, "sack[ing]" Mr. Hancock in a chokehold. *Id.* at 219. Mr. Jett then hit Mr. Hancock in the shin with the metal bar. Nonetheless, Mr. Hancock was able to wrestle the gun away from Mr. Jett. While under attack from both men, Mr. Hancock pointed the gun at Mr. Jett and pulled the trigger twice. But Mr. Jett did not flinch and tried to hit the gun out of Mr. Hancock's hands.

At that moment, Mr. Hancock said to Mr. Jett: "I just killed you, bitch." *Id.* at 221. Mr. Jett then looked down at his chest, noticed that he had been shot and said "[y]eah, you did." *Id.* Mr. Jett dropped the metal bar and "took off." *Id.*

Mr. Hancock then pushed the gun into what he thought was Mr. Lynch's chest and fired.

Scrambling to his feet, Mr. Hancock told Ms. Tarp to leave. She did, retreating to the bedroom.

Mr. Hancock went into the Harley Room to look for Mr. Jett. At that point, Mr. Hancock heard something in the back of the house, which he believed might be Mr. Jett. Mr. Hancock worried that Mr. Jett had gone to one of the bedrooms to get his assault rifle.

According to Mr. Hancock: "[A]ll I could think of is I had to get out of that house, I had to get some distance away from [Mr. Jett] because he was close to getting [the assault rifle]." *Id.*

Mr. Hancock went out the back door, finding the backyard "pitch black." *Id.* After three steps, he ran into Mr. Jett, who began kicking. Mr. Hancock shot Mr. Jett in a "knee-jerk reflex." *Id.*

#### 3. Mr. Jones's Version

Mr. Jett's next-door neighbor, Mr. Donald Jones, testified that he had awoken to the sound of gunfire. He could tell that

the shots had come from the direction of Mr. Jett's property.

When Mr. Jones heard the shots, he took cover on the floor. Seconds later, Mr. Jones heard Mr. Jett's back door open and close. As the door closed, Mr. Jones overheard Mr. Jett pleading for someone named "Marvin" not to shoot. Trial Tr., vol. V, at 15. A moment later, Mr. Jones heard a loud shot.

### H. Mr. Hancock's Departure

After hiding for several minutes, Ms. Tarp emerged from the back bedroom and headed toward the living room. According to Ms. Tarp, the living room was "a mess" and Mr. Lynch was lying dead "on the coffee table" with blood oozing from his chest and face. Trial Tr., vol. VII, at 188.

Ms. Tarp grabbed her purse and walked toward the front door. When she turned toward the door, she saw Mr. Hancock standing next to the door, pointing the gun in her direction. Ms. Tarp closed her eyes, believing she was about to be shot.

But Mr. Hancock did not shoot. In a calm voice, he apologized to Ms. Tarp for what she had seen and told her to wait two minutes before leaving. She complied.

### III. Review of Habeas Claims

In considering this habeas appeal, we are bound by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA restricts the circumstances in which federal courts may grant habeas relief to a state prisoner. *See* 28 U.S.C. § 2254 (2012) (listing some of the criteria under which federal courts can entertain state prisoners' applications for writs of habeas corpus). Two of these restrictions are codified at 28 U.S.C. § 2254(d). Under § 2254(d), habeas courts cannot grant relief "with respect to any claim that was adjudicated on the merits in State court" unless the adjudication was

- contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
- based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2012).

Section 2254(d) provides "precondition[s] to the grant of habeas relief ..., not an entitlement to it." *Fry v. Pliler*, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). Thus, even when petitioners satisfy the threshold in § 2254(d), they must establish a violation of federal law or the federal constitution. 28 U.S.C. § 2254(a) (2012); *Wilson v. Corcoran*, 562 U.S. 1, 5–6, 131 S.Ct. 13, 178 L.Ed.2d 276 (2010) (per curiam).

### IV. Evidence of the Prior Manslaughter Conviction and the Plea of Self–Defense

Mr. Hancock urges habeas relief based on deprivation of due process when the state district court allowed evidence that he

- had been convicted of manslaughter in 1982 and
- had pleaded self-defense in that case.

The OCCA rejected this claim. *Hancock v. State*, 155 P.3d 796, 813–15 (Okla.Crim. App.2007). Notwithstanding that decision, Mr. Hancock urges a right to habeas relief on grounds that the OCCA

- did not adjudicate the merits of the due process claim and
- based its decision on an unreasonable factual determination.

We reject both arguments.

### A. Adjudication on the Merits

The AEDPA restricts habeas review when the state appellate court has

rejected a claim on the merits,[2] and the OCCA unquestionably rejected Mr. Hancock's claim on the merits. In doing so, however, the OCCA did not refer to the claim as one involving denial of due process. Based on this omission, Mr. Hancock argues that the OCCA's decision did not encompass the due process claim. We reject this argument because Mr. Hancock failed to raise it in district court and the OCCA's plain-error review was tantamount to review for due process.

In federal district court, Mr. Hancock did not question the existence of an adjudication on the merits. Because Mr. Hancock did not raise this issue in federal district court, we consider the argument "forfeited." *See Olmos v. Holder,* 780 F.3d 1313, 1326–27 (10th Cir.2015) (stating that a habeas petitioner forfeited a claim by failing to raise it in his habeas petition in district court). Ordinarily, we would consider the forfeited argument under the plain-error standard. *Id.* at 1327. But Mr. Hancock has not asserted plain error. Thus, we do not engage in plain-error review. *See id.* (declining to consider an argument under the plain-error standard because the habeas petitioner had failed to urge plain error).

The argument is not only forfeited, but also invalid. The OCCA concluded that Mr. Hancock had waived the argument by eliciting evidence of the manslaughter conviction in direct examination. *Hancock v. State,* 155 P.3d 796, 813–14

(Okla.Crim.App.2007). In Oklahoma, the appellate court conducts plain-error review when the defendant has waived an argument in the state district court. *E.g., Sonnier v. State,* 334 P.3d 948, 950 (Okla.Crim. App.2014); *Miller v. State,* 313 P.3d 934, 971 (Okla.Crim.App.2013). Thus, the OCCA considered the issue under the plain-error standard, concluding that the evidentiary ruling did not constitute plain error. *Hancock,* 155 P.3d at 814–15.[3]

Oklahoma's formulation of the plain-error standard is virtually identical to the constitutional test for due process. *Compare Cleary v. State,* 942 P.2d 736, 753 (Okla.Crim.App.1997) ("Error which impinges on the fundamental fairness of trial is plain error."), *with Bullock v. Carver,* 297 F.3d 1036, 1055 (10th Cir.2002) (explaining that an evidentiary ruling violates federal due process if it " 'fatally infected the trial and denied fundamental fairness' " (quoting *Revilla v. Gibson,* 283 F.3d 1203, 1212 (10th Cir.2002))). Thus, when the OCCA rejected Mr. Hancock's claim under the plain-error standard, the decision effectively disallowed the possibility of a due process violation. *See Thornburg v. Mullin,* 422 F.3d 1113, 1124–25 (10th Cir. 2005) (holding that the OCCA had adjudicated the merits of a due process claim because the OCCA's analysis of plain error involved the same test used to determine whether there was a denial of due process). In these circumstances, the OCCA's decision constituted an adjudica-

---

**2.** *See* p. 1010, above.

**3.** In our court, we regard waiver differently. *See* p. 1017, below. When a waiver takes place, we do not consider the claim at all, even under the forgiving plain-error standard. *United States v. Cornelius,* 696 F.3d 1307, 1319 (10th Cir.2012). Thus, in our court, waiver of the issue would have precluded any relief. *See Ohler v. United States,* 529 U.S. 753, 754–55, 120 S.Ct. 1851, 146 L.Ed.2d 826

(2000) (holding that the defendant could not appeal a ruling that allowed impeachment through a prior felony conviction because the defendant had preemptively elicited the evidence on direct examination); *United States v. Wagoner Cnty. Real Estate,* 278 F.3d 1091, 1099 (10th Cir.2002) (holding that a party could not argue on appeal that a conviction was erroneously allowed for impeachment under Fed.R.Evid. 609 because the party had preemptively elicited the evidence).

tion on the merits of the due process claim. *See id.*

### B. Unreasonable Determination of the Facts

Mr. Hancock argues that the OCCA mistakenly thought that the district court had allowed the testimony as impeachment evidence under Okla. Stat. tit. 12, § 2609(B). This section governs impeachment of witnesses with convictions more than ten years old. If the OCCA had misunderstood the basis for the district court's ruling, as Mr. Hancock argues, the mistake would likely have constituted an unreasonable determination of fact and allowed us to consider the merits of the underlying constitutional claim. *See Byrd v. Workman,* 645 F.3d 1159, 1171–72 (10th Cir.2011) (stating that the OCCA's factual determination could have been unreasonable under 28 U.S.C. § 2254(d)(2) if the OCCA had relied on a misunderstanding of the record and the disposition was based on that misunderstanding). But Mr. Hancock has not demonstrated a factual misunderstanding in the OCCA's opinion.

▇ As the petitioner, Mr. Hancock bears the burden of showing an unreasonable determination of fact. *See Lott v. Trammell,* 705 F.3d 1167, 1177 (10th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 176, 187 L.Ed.2d 120 (2013) (stating that the petitioner bore the burden of establishing that the OCCA's decision constituted an unreasonable determination of the facts); *Gilbert v. Mullin,* 302 F.3d 1166, 1181 (10th Cir.2002) (same).

To determine whether Mr. Hancock has satisfied his burden, we must interpret the OCCA's explanation for its decision to affirm the conviction. In engaging in this interpretation, we examine the context and language in the OCCA's opinion.

The OCCA was determining whether the district court had erred in allowing two types of evidence: (1) Mr. Hancock's prior assertion of self-defense, and (2) his manslaughter conviction in 1982. As Mr. Hancock argues, the state district court did not rely on § 2609(B) in allowing either type of evidence. Though the district court did not identify the pertinent rule, there are two possibilities. The court might have allowed the evidence either as evidence of "other acts" (governed by Okla. Stat. tit. 12, § 2404(B)) or as a form of relevant evidence. Though the state district court did not rely on § 2609(B), the OCCA clearly did. But the OCCA did not say whether it thought the district court had relied on § 2609(B).

We can reach the merits of the constitutional claim only if Mr. Hancock showed that the OCCA rested its decision on a factually mistaken view of the record. *See Byrd v. Workman,* 645 F.3d 1159, 1172 (10th Cir.2011) (stating that the OCCA's decision would have been "based on" an unreasonable factual determination only if the decision had rested upon the mistake). This is a " 'daunting' " burden, " 'one that will be satisfied in relatively few cases.' " *Id.* (quoting *Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir.2004)).

There are two ways of reading the OCCA's opinion. The OCCA was either

1. affirming under the mistaken belief that the district court had allowed the evidence under § 2609(B), or

2. affirming because the result (admission of the manslaughter conviction) was correct even though the reasoning in the district court was wrong. *See McClendon v. State,* 777 P.2d 948, 951 (Okla.Crim.App.1989) ("While the [state district] court apparently relied upon the coconspirator rule to admit the challenged hearsay, this Court may sustain the admission of hearsay on a different

theory, so long as the alternative basis for admission finds support in the record.").

Everything in the OCCA's opinion is consistent with either interpretation.

On appeal, the State defended the district court's ruling while acknowledging that the district court had not relied on § 2609. Appellee's Resp. Br. at 27, *Hancock v. State*, No. D–2004–1097 (Okla.Crim. App. Feb. 10, 2006). Nonetheless, the State argued that the OCCA could affirm based on its independent determination that the evidence was admissible under § 2609(B). *Id.* at 28.

In addressing this argument, the OCCA acknowledged Mr. Hancock's characterization of the district court's rationale. The OCCA stated that Mr. Hancock had characterized the district court's decision as "either a 'hybrid' interpretation of sections 2609 and 2404(B), or a creative innovation on the 'near miss' admissibility for hearsay under 12 O.S. Supp.2002, § 2804.1." *Hancock v. State*, 155 P.3d 796, 814 (Okla.Crim. App.2007). Then, the OCCA said that the State had defended the ruling based on Oklahoma common law. *Id.* The OCCA ultimately concluded that the evidence was admissible under § 2609. *Id.* at 815. In doing so, however, the OCCA did not say whether it (1) thought this was the district court's rationale or (2) adopted the State's argument that affirmance would be appropriate even if the district court had not invoked § 2609(B).

Mr. Hancock argues that the OCCA thought the district court had relied on § 2609. To support this argument, Mr. Hancock points out that the OCCA said that the district court had weighed the probative value against the prejudicial effect. But this statement is consistent with either interpretation of the OCCA's opinion. Under § 2404(B), § 2609(B), or the rule governing admissibility of relevant evidence (Okla. Stat. tit. 12, § 2402), the state district court would have needed to weigh the probative value against the danger of unfair prejudice.

In his thoughtful dissent, Judge Lucero relies on the OCCA's

- statement that the district court had ruled the evidence inadmissible under other rules,
- reliance on the plain-error standard of review,
- failure to address prejudice, and
- reference to the state district court's weighing of probative and prejudicial effects "for this purpose."

Dissent at 1035–38. We respectfully believe that these aspects of the OCCA's opinion do not render its fact-finding unambiguous.[4]

As Judge Lucero points out, the OCCA noted that the state district court had ruled the evidence inadmissible under Okla. Stat. tit. 12, § 2404(B). Judge Lucero adds that the OCCA "rejected both Hancock's 'hybrid' theory and the state's common law theory, ... stat[ing] that the Evidence Code provided a basis for admissibility." Dissent at 1035. In Judge Lucero's view, § 2609(B) was the only remain-

---

4. The dissent criticizes the majority for misapplying AEDPA deference, urging that "AEDPA deference is meant to prevent federal judges from reversing state-court merits decisions based on mere disagreement." Dissent at 1032. But we are bound by the AEDPA's text if it is unambiguous. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). And the text unambiguously puts the burden on a petitioner to show that the state appellate court made a mistake of fact. 28 U.S.C. § 2254(e)(1) (2012). Under the facts of this case, the ambiguity of the OCCA decision means that Mr. Hancock has failed to meet that burden.

ing evidentiary provision that the state appellate court could have regarded as the basis for the district court's ruling. *Id.*

In our view, the dissent conflates two different things: (1) what the OCCA regarded as the proper basis for introducing the evidence, and (2) what the OCCA thought the district court had relied on. There are many possible grounds that a district court could have considered. Some are mentioned in the dissent: the State's "hybrid" theory, common law, and § 2404(B). Or, the district court might have considered the evidence as admissible simply because it was "relevant" and not barred by any other rule or law. *See* Okla. Stat. tit. 12, § 2402 (2001).

The dissent states that the OCCA rejected all of these sources of authority. But that is not our issue; our issue is whether the OCCA mistakenly thought the district court had relied on § 2609(B). The OCCA did not say that the district court had ruled the evidence inadmissible under principles of relevance, a "hybrid" theory, or the common law. Instead, the OCCA simply noted that the district court had ruled the evidence inadmissible under § 2404(B). *Hancock v. State,* 155 P.3d 796, 814 (Okla.Crim.App.2007). There are many other sources of authority that the district court might have relied on, and the OCCA did not say what it thought the district court's rationale had been. Rightly or wrongly, the OCCA didn't think it needed to do so.

The dissent also refers to the fact that the OCCA relied on the standard of review for plain error rather than harmlessness. In our view, that distinction is not decisive.

 Oklahoma courts apply a four-part test for plain error, considering whether (1) an error was committed, (2) whether the error was obvious, (3) whether the error affected the defendant's substantial rights, and whether the error seriously affected the fairness, integrity, or reputa-

tion of the judicial proceedings. *Levering v. State,* 315 P.3d 392, 394 (Okla.Crim.App. 2013).

The dissent acknowledges that the OCCA could have applied this test by analyzing the issue in terms of harmlessness. Dissent at 1037. But the dissent argues that the OCCA instead chose to review what the district court had decided. *Id.* In our view, however, the dissent reads too much into the OCCA's opinion.

Under the plain-error standard, the first two prongs require the reviewing court to analyze what the district court decided. Otherwise the reviewing court could not decide whether the district court had erred or, if it did, whether that error would have been obvious.

But the third prong of plain-error review (an effect on the defendant's substantial rights) does not necessarily involve scrutiny of what the district court did. Instead, this prong is substantially similar to the standard for harmlessness. *See Logsdon v. State,* 231 P.3d 1156, 1166 (Okla.Crim.App.2010) (equating the tests for harmlessness and an effect on the defendant's substantial rights for purposes of plain-error review); *see also United States v. Kieffer,* 681 F.3d 1143, 1158 (10th Cir. 2012) ("Rule 52(a) harmless error analysis and the third or 'substantial rights' prong of Rule 52(b) plain error analysis 'normally require[ ] the same kind of inquiry.'" (quoting *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993))).

In effect, the dissent is arguing that the OCCA purported to rely on one of the first two prongs (rather than the third) based on its reference to what the district court did. Respectfully, we disagree with the dissent's characterization of the OCCA's reasoning.

In the paragraph discussing plain error, the OCCA discussed the standard for plain error and the government's primary purpose for introducing the manslaughter evidence. The OCCA then wrote: "The record as a whole shows the District Court weighed both the probative value of the evidence for this purpose and its prejudicial effect." *Hancock v. State*, 155 P.3d 796, 815 (Okla.Crim.App.2007). This sentence could mean two different things:

1. The OCCA was analyzing the district court's conduct to determine whether the district court actually admitted the evidence under § 2609(B).

2. The OCCA was analyzing whether the district court performed the balancing inquiry under Okla. Stat. tit. 12, § 2403 to determine whether the district court's admission of the evidence affected Mr. Hancock's substantial rights.

The dissent relies on the OCCA's reference to what the district court did, inferring from that reference that the OCCA must have been relying on one of the first prongs of plain error.[5] But the OCCA could have considered what the district court did and still relied on the third prong of the plain-error standard.

In Oklahoma, evidence is ordinarily admissible—regardless of the underlying basis of admissibility—only if the probative value is not substantially outweighed by the danger of unfair prejudice. Okla. Stat. tit. 12, § 2403 (2001). Thus, whatever rule the district court had relied on, the OCCA could conclude that the evidence was admissible only if the probative value had not been substantially outweighed by the danger of unfair prejudice.

In addressing that requirement, the OCCA had two choices: It could balance the probative and prejudicial effects in the first instance, or it could rely on the district court's balancing. The OCCA could reasonably decide to rely on the district court's balancing.[6] Thus, the reference to the district court's balancing of probative value and prejudice could relate to § 2403(B) balancing. Thus, the reference to the district court's balancing does not unambiguously show that the OCCA was mistaken about the basis of the district court's ruling.[7]

---

5. Judge Lucero contends that we are operating on a "false premise," stating that "[i]f the OCCA had in fact affirmed the trial court on alternate grounds, it would have said so, just as we do in our opinions." Dissent at 1033. We respectfully disagree. The OCCA said it was applying the plain-error test. *Hancock v. State*, 155 P.3d 796, 814 (Okla.Crim.App. 2007). In effect, our inquiry is whether the appeals court was applying the first or second prong of the test (no obvious error by the district court) or the third (no effect on the defendant's substantial rights). In our court, we typically specify which prong of the plain-error test we are applying. The OCCA didn't. Thus, all we can discern is that the OCCA wrote the opinion differently than we might have.

6. In addressing the federal counterpart to § 2403, the Supreme Court has stated:

> Rather than assess the relevance of the evidence itself and conduct its own balancing of the probative value and potential prejudicial effect, the Court of Appeals should have allowed the District Court to make these determinations in the first instance, explicitly and on the record. With respect to evidentiary questions in general and Rule 403 in particular, a district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it.
> *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) (citation & footnote omitted).

7. Judge Lucero also contends that the state appellate court failed to consider prejudice, which would have been necessary for admission of the evidence under § 2609(B). Dissent at 1037–38. But as discussed above, the state appellate court would have had to con-

The dissent also relies on the OCCA's discussion about the purpose of the evidence. In this discussion, the OCCA commented about the district court's introduction of the manslaughter evidence "for this purpose." *Hancock v. State*, 155 P.3d 796, 815 (Okla.Crim.App.2007). Referring to this comment, Judge Lucero links the phrase "this purpose" to "the purpose of admitting the evidence under § 2609(B)." Dissent at 1036–37. But the OCCA did not say that "this purpose" was introduction of the evidence under § 2609(B).

Instead, the OCCA identified the district court's purpose in the immediately preceding sentence: "Despite the creative exchange of theories for and against the District Court's ruling, the State's manifest purpose in offering evidence of the prior conviction and Appellant's prior plea of self-defense was *to attack the credibility of Appellant's current plea of self-defense.*" *Hancock v. State*, 155 P.3d 796, 815 (Okla. Crim.App.2007) (emphasis added). Thus, the phrase "this purpose" referred to the credibility of Mr. Hancock's "current plea of self-defense"—not the credibility of the defendant. *Id.*

The cited purpose—the credibility of the plea of self-defense—might have led the district court to admit the evidence under a variety of theories of admissibility, such as the State's hybrid theory, common law, § 2402—or § 2609(B). The OCCA's sentence tells us little about its understanding of the basis for the district court's ruling.

■ The OCCA did not tell us what it thought the district court had relied on to admit the evidence. We have searched for clues, as the dissent has done. But all of these clues are equally consistent with a correct understanding of the basis for the district court's ruling. In these circumstances, we conclude that Mr. Hancock has failed to prove that the OCCA's decision was based on an unreasonable determination of the facts.

## C. Unreasonable Application of Federal Law

In oral argument, Mr. Hancock argued that the OCCA's decision had constituted an unreasonable application of federal law. Oral Arg. 22:22–22:45. If federal law was unreasonably applied, we could entertain the merits even if the OCCA had not unreasonably determined the facts. *See* p. 1010, above (citing 28 U.S.C. § 2254(d) (2012)). But Mr. Hancock did not raise this argument in the appeal until oral argument. Appellant's Reply Br. at 1[8]; *see* Oral Arg. 22:45–22:54 (admitting that Mr. Hancock did not directly argue in his briefs that the OCCA's decision had consti-

---

sider prejudice regardless of whether it was applying § 2609(B) in the first instance or reviewing the district court's application of § 2609(B). Thus, if the state appeals court failed to consider prejudice (as Judge Lucero contends), we could infer that the court misapplied § 2609(B). But that misapplication of § 2609(B) could not logically support an inference that the appeals court was mistaken about the basis of the district court's ruling.

**8.** In his reply brief, Mr. Hancock argues:

This is a "(d)(2)" case. That is, for both of Mr. Hancock's due process claims, this Court may pass through the AEDPA's portal to *de novo* review under 28 U.S.C. § 2254(d)(2), because the Oklahoma Court of Criminal Appeals's decision was based on unreasonable factual determinations.

. . . .

The State also devotes much of its answer brief to arguing that the OCCA's decision was not contrary to or an unreasonable application of clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(*1* ). Mr. Hancock has not argued otherwise, as he is not required to satisfy *both* section (d)(1) and section (d)(2). Either one is sufficient to open the door to relief, and Mr. Hancock has shown that section (d)(2) opens the door in this case. Appellant's Reply Br. at 1.

tuted an unreasonable application of federal law).

■ In our court, an issue is waived when it is presented for the first time in oral argument. *See United States v. Rivera–Nevarez,* 418 F.3d 1104, 1112 n. 12 (10th Cir.2005) ("[I]ssues raised for the first time at oral argument are waived."). Thus, Mr. Hancock waived any argument that the OCCA unreasonably applied federal law. In light of this waiver, we decline to consider Mr. Hancock's new argument involving an unreasonable application of federal law. *See* p. 1011 n. 3, above.

## V. Jury Instructions and Closing Argument

Mr. Hancock also urges deprivation of due process because the state district court

- instructed the jury on limitations of self-defense even though these limitations were unsupported by the evidence and
- allowed the prosecutor to make deceptive closing remarks based on these instructions.

Mr. Hancock unsuccessfully presented these arguments to the OCCA. *Hancock v. State,* 155 P.3d 796, 819–20 (Okla.Crim. App.2007). We too reject these arguments.

### A. Jury Instructions

We begin with the challenged jury instructions.

### 1. The Decision to Give the Instructions

At trial, the court instructed the jury on the right to self-defense and the "aggressor" exception to that defense. Crim.App. Orig. R., vol. VII, at 1219–26. On self-defense, the court instructed the jury that (1) the State had the burden to disprove self-defense and (2) a person acts in self-defense if he "reasonably believe[s] that use of deadly force [is] necessary to protect himself from imminent danger of death or great bodily harm." *Id.* at 1220–21. The court also gave three instructions on the "aggressor" exception to self-defense [9]:

- **Instruction 22:** "Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who was the aggressor or provoked another with the intent to cause the altercation or voluntarily entered into mutual combat, no matter how great the danger to personal security became during the altercation unless the right of self-defense is reestablished."

- **Instruction 23:** "A person who was the original aggressor or provoked another with intent to cause the altercation or voluntarily entered into mutual combat may regain the right to self-defense if that person withdrew or attempted to withdraw from the altercation and communicated his desire to withdraw to the other participant(s) in the altercation. If thereafter, the other participant(s) continued the altercation, the other participant(s) [would become] the aggressor(s). And the person who was the original aggressor or provoked another with the intent to cause the altercation or voluntarily entered into mutual combat is entitled to the defense of self-defense."

 . . . .

- **Instruction 25:** "A person is an aggressor when that person by his wrongful acts provokes, brings about,

---

9. The state district court provided a fourth instruction on the "aggressor" exception (Instruction 24). But Mr. Hancock does not challenge that instruction.

or continues an altercation. The use of words alone cannot make a person an aggressor."

*Id.* at 1222–23, 1225.

At trial, Mr. Hancock objected, arguing there was no evidentiary basis for three parts of the instructions:

1. Self-defense is not available to a person who "voluntarily enters into mutual combat" with the victim.

2. A person can regain the right to self-defense if he "withdrew or attempted to withdraw from the altercation and communicated his desire to withdraw."

3. The "use of words alone" cannot turn someone into an aggressor.

The district court overruled this objection, reasoning that (1) there was evidence that Mr. Hancock had engaged in "mutual combat" with Mr. Jett and that Mr. Jett had "withdrawn" from the altercation and (2) the "words alone" portion was warranted because it accurately stated the law and "the jury need[ed] to know that" words alone would not trigger the defense. Trial Tr., vol. IX, at 59–61. This ruling was upheld on appeal, with the OCCA holding that the instructions had been properly given. *Hancock v. State,* 155 P.3d 796, 819–20 (Okla.Crim.App.2007).

## 2. Sufficiency of Evidence for the Instructions

Mr. Hancock renews his argument that there was no evidentiary basis to include the three challenged portions of the instructions. We disagree, concluding that there was evidence of mutual combat and Mr. Jett's withdrawal from the altercation. Thus, those portions of the instructions

were supported. Even if there had been no evidentiary basis to include reference to "words alone," inclusion of this phrase would not have deprived Mr. Hancock of a fair trial.

### a. Mutual Combat

■ First, there was evidence that Mr. Hancock had engaged in mutual combat with Mr. Jett; thus, the OCCA reasonably concluded that the "mutual combat" portion of the instructions was supported. *Id.*

"Mutual combat" is defined as "[a] fight between two or more parties into which each party has entered willingly." Okla. Uniform Jury Instructions—Criminal (OUJI–CR) 8–56, Vernon's Okla. Forms 2d (West 2001) (citing *Phelps v. State,* 64 Okla.Crim. 240, 78 P.2d 1068 (1938) & *Weatherholt v. State,* 9 Okla.Crim. 161, 131 P. 185 (1913)).

Though Mr. Jett started the altercation, there was also evidence of two breaks in the action, where a jury could reasonably find that Mr. Hancock had willingly joined the fray.

The first break in the action took place in the living room. Both Ms. Tarp and Mr. Hancock testified that Mr. Jett had paused and moved away from where Mr. Hancock was seated. Trial Tr., vol. VI, at 180 (Tarp); Trial Tr., vol. VII, at 218–19 (Hancock). The extent of this break is disputed, with Ms. Tarp and Mr. Hancock giving different accounts.[10] But both witnesses testified that Mr. Jett had taken at least a step away from Mr. Hancock, who then went for Mr. Jett's gun.

The second break took place when Mr. Jett went to the Harley Room, and Mr. Hancock followed.

---

10. Ms. Tarp testified that (1) Mr. Jett had swung the metal bar at Mr. Hancock and walked toward the coffee table and (2) Mr. Hancock "attacked" Mr. Jett. Trial Tr., vol.

VI, at 177–81. In contrast, Mr. Hancock testified that he had reached for the gun only after Mr. Jett moved to the threshold between the living room and dining room.

With evidence of these two breaks in the action, the jury could reasonably have reached two different conclusions. The jury might have discounted the significance of these two breaks and concluded that Mr. Hancock was acting in desperation to defend himself. After all, Mr. Hancock had just been attacked and told to get into a cage.

But jurors could also reasonably arrive at a different conclusion. Regardless of how far Mr. Jett moved in the living room, both accounts had him moving away from Mr. Hancock. And, Ms. Tarp's account of the events had Mr. Hancock, armed with a gun, chasing Mr. Jett out to the backyard.

Even if the jury had accepted Mr. Hancock's account, it could still conclude that there was a break in the action before the killing of Mr. Jett. Mr. Hancock admitted that he had gone to the Harley Room, explaining that he wanted to see where Mr. Jett had gone. Jurors could reasonably conclude that Mr. Hancock had known he was no longer in danger, for he was now the one holding the gun and trying to find Mr. Jett. If Mr. Hancock remained afraid after the initial shooting, why would he follow Mr. Jett into the Harley Room, which was in the opposite direction from the front door? If Mr. Jett was going to the Harley Room, the front door would have provided a sure-fire escape route. Instead, Mr. Hancock followed Mr. Jett to the Harley Room, moving further away from the front door.

The diagram was taken from State's Exhibit 81, which was admitted without objection as a fair representation of the layout of Mr. Jett's house. Trial Tr., vol. V, at 44–45. We have positioned Mr. Hancock based on his testimony: He testified that when he arose, he was standing "where [Mr. Lynch's] head was at." Trial Tr., vol. VII, at 221. The large arrow shows where Mr. Hancock went; the small

arrow shows the easy path that Mr. Hancock had to leave the home when Mr. Jett ran in the opposite direction.

Because the jury could rationally find that Mr. Hancock had willingly joined the fight, the OCCA reasonably concluded that the instruction on mutual combat was supported by the evidence. Thus, the OCCA reasonably concluded that inclusion of this instruction had not deprived Mr. Hancock of a fair trial.

### b. Withdrawal from the Altercation

■ The OCCA also held that the "withdrawal" instruction was supported by the evidence. *Hancock v. State*, 155 P.3d 796, 819–20 (Okla.Crim.App.2007).

This instruction would be appropriate if there was evidence that

● Mr. Jett had withdrawn or intended to withdraw from the altercation, and

● Mr. Jett had communicated that intent to Mr. Hancock.

*See Allen v. State*, 871 P.2d 79, 92 (Okla. Crim.App.1994); see also OUJI–CR 8–51, Vernon's Okla. Forms 2d (West 2001) (explaining that the original aggressor may gain the right to self-defense if he withdraws).

First, there was evidence that Mr. Jett had withdrawn by stepping away from Mr. Hancock in the living room. Ms. Tarp identified three facts supporting this inference:

1. Mr. Jett had been preparing to leave his home when Mr. Jett became agitated at Mr. Hancock.

2. After attacking Mr. Hancock, Mr. Jett "walked back towards the coffee table . . . in the direction of the front door." [11]

3. Ms. Tarp did not recall whether Mr. Jett was continuing to hold the met-

al bar when Mr. Jett walked away from Mr. Hancock.

Second, there was evidence supporting withdrawal when Mr. Jett went into the Harley Room and later into the backyard. In his reply brief, Mr. Hancock argues that the prosecutors never argued withdrawal based on the events in the backyard and that Mr. Hancock testified that he had thought Mr. Jett had gone to get his rifle. Appellant's Reply Br. at 19. We reject both arguments.

At trial, the prosecutors did argue that Mr. Jett had withdrawn by running into the backyard. For example, after discussing the events in the living room, the prosecutors focused on Mr. Hancock's pursuit of Mr. Jett into the backyard:

> The defendant's not done though. Because he goes out, through the Harley room, and chases Robert Jett outside and shoots him one more time. Now, he's curious about where that shot went.

> How is he defending himself when he is hunting down the people that he is killing? How in the world does he get to claim self-defense when he chases Robert Jett outside and kills him in the backyard? You don't get self-defense in those—under those circumstances, ladies and gentlemen.

Trial Tr., vol. X, at 49.

Mr. Hancock gave a different account, but that did not preclude an instruction on withdrawal. Ms. Tarp testified that Mr. Hancock had shot Mr. Jett, then chased him outside "like a dog." Trial Tr., vol. VI, at 185. Based on this testimony, the jury could reasonably have concluded that Mr. Jett had withdrawn when he entered the Harley Room and left through the back door.

**11.** Trial Tr., vol. VI, at 180.

In these circumstances, the state district court properly instructed the jury on withdrawal. Thus, the instruction did not deprive Mr. Hancock of a fair trial.

#### c. "Words Alone"

The OCCA also rejected Mr. Hancock's challenge to the "words alone" instruction. *Hancock v. State*, 155 P.3d 796, 819–20 (Okla.Crim.App.2007). This decision involved a reasonable application of Supreme Court precedent and determination of the facts.

The "words alone" instruction was provided with the definition of an "aggressor":

> **Instruction 25:** A person is an aggressor when that person by his wrongful acts, provokes, brings about, or continues an altercation. The *use of words alone* cannot make a person an aggressor.

Crim.App. Orig. R., vol. VII, at 1225 (emphasis added).

The second sentence ("words alone") may have been superfluous because no one suggested that Mr. Jett had used "words alone." Both sides stated that Mr. Jett had swung a metal bar at Mr. Hancock while telling him to get in a cage. *Compare* Trial Tr., vol. VII, at 218 (Mr. Hancock) ("[The metal bar] hit me in the arm."), *with* Trial Tr., vol. VI, at 177 (Ms. Tarp) ("I don't know if [Mr. Jett] hit [Mr. Hancock] on the side of the head or if he just came close to it."). The jury would undoubtedly know that Mr. Jett used more than "words alone."

 But even if the phrase were superfluous, it would not have rendered the trial fundamentally unfair. No one ever questioned Mr. Hancock's right to defend himself when told to get into the cage. The issue was whether the danger had

subsided by the time Mr. Hancock pulled the trigger. Thus, in rejecting the claim, the OCCA reasonably applied Supreme Court precedent and determined the facts.

#### 3. Summary

The OCCA reasonably concluded that the self-defense instructions, including the three challenged portions, had not deprived Mr. Hancock of a fair trial.

### B. Closing Argument

In urging a deprivation of due process, Mr. Hancock also points to the prosecution's closing remarks.

#### 1. Withdrawal

In closing, the prosecutor argued that Mr. Jett had withdrawn from the altercation and that Mr. Hancock had become the aggressor in the living room. The State outlined this theory in two steps:

1. Although Mr. Jett provoked the fight, he walked away from Mr. Hancock and toward the front door.
2. Mr. Hancock became the aggressor when he "[came] up from behind and rushe[d] [Mr. Jett] for the gun."

Trial Tr., vol. X, at 107. Mr. Hancock contends that these arguments were "grossly misleading." We disagree.

#### a. Mr. Jett Turning His Back and Walking to the Front Door

The prosecution argued that Mr. Jett had withdrawn from the fight by turning his back to Mr. Hancock and walking to the front door. In his opening brief, Mr. Hancock states that this argument distorts Ms. Tarp's testimony. Appellant's Opening Br. at 62–64. But in the habeas petition, Mr. Hancock did not present this allegation as a separate basis for habeas relief.[12] As a result, this issue has been

---

**12.** In the direct appeal and habeas petition,

Mr. Hancock made this statement in a foot-

forfeited. *See Olmos v. Holder*, 780 F.3d 1313, 1326 (10th Cir.2015) ("Mr. Olmos forfeited [his appellate] argument by failing to raise it in his habeas petition."); *see also* p. 1010–11, above. Though we could ordinarily consider the issue under the plain-error standard, Mr. Hancock has not argued plain error. *See Olmos*, 780 F.3d at 1326 (stating that we would consider a forfeited argument if the petitioner had urged plain error); *see also* pp. 1010–11, above. Thus, we decline to consider Mr. Hancock's new argument involving distortion of Ms. Tarp's testimony. *See Olmos*, 780 F.3d at 1326 (declining to consider a forfeited argument because the petitioner had not urged plain error); *see also* p. 1011, above.

### b. Becoming the Aggressor

The prosecution also argued that Mr. Hancock had become the aggressor when he rushed Mr. Jett and obtained his gun. Mr. Hancock again states that this argument distorts Ms. Tarp's testimony.

But in the habeas petition, Mr. Hancock did not present this argument as a separate basis for habeas relief. Instead, he simply questioned the existence of evidence for an instruction on whether Mr. Hancock had become the aggressor.[13] As a result, this argument is forfeited. *See* pp. 1010–11, 1022, above. Because Mr. Hancock has not argued plain error, we decline to consider the new argument. *See id.* at pp. 1011, 1022, above.

Mr. Hancock also questions the State's argument that he became the aggressor by lunging at Mr. Jett in the living room. But this challenge cannot form the basis for habeas relief because Mr. Hancock omitted the issue in his habeas petition and he has not argued plain error. *See id.*

### 2. Factual Misstatements

Mr. Hancock also contends the prosecutor misstated three additional facts: (1) Mr. Hancock was angry and looking for a fight, (2) Mr. Lynch was physically incapacitated, and (3) the fight took place near the door rather than the sofa. But Mr. Hancock forfeited these arguments by failing to raise them in his habeas petition and failing to argue plain error. *See Olmos v. Holder*, 780 F.3d 1313, 1326–27 (10th Cir. 2015); *see also* pp. 1010–11, 1021–22, above.

## VI. Ineffective Assistance of Trial Counsel

■■■ In Oklahoma, manslaughter can be committed by killing someone while acting in the heat of passion or by resisting a criminal attempt.[14] At trial, Mr. Hancock's attorney asked for an instruction on heat-of-passion manslaughter, but not manslaughter while resisting a criminal attempt. In Mr. Hancock's view, this omission constituted ineffective assistance

---

note consisting of a single sentence: "To make matters worse, this was clearly a misstatement of Ms. Tarp's testimony since she never testified Mr. Jett *turned his back* on Mr. Hancock and was preparing to walk out the front door when Mr. Hancock *rushed him from behind.* (Tr. VI, 180–81, 206, 233.)" Hab. Pet. at 214 n.45, *Hancock v. Workman*, No. 5:08–cv–327–F (W.D. Okla. filed Feb. 3, 2009) (unpublished) (Dkt. 27); Appellant's Opening Br. at 50 n.37, *Hancock v. State*, No. D–2004–1097 (Okla.Crim.App. Nov. 23, 2005).

13. There unquestionably was evidence of Mr. Hancock becoming the aggressor when he followed Mr. Jett into the Harley Room. *See* pp. 1018–19, above. In fact, Ms. Tarp described the pursuit as akin to someone chasing a dog. Trial Tr., vol. VI, at 185.

14. Manslaughter can also be committed through the commission of a misdemeanor. Okla. Stat. tit. 21, § 711(1) (2001). But this form of manslaughter is not involved in our appeal.

of trial counsel. We conclude that the OCCA reasonably applied Supreme Court precedent in rejecting the claim. Thus, we reject the claim.

### A. Manslaughter by Resisting a Criminal Attempt

The crime of manslaughter while resisting a criminal attempt occurs when a person kills another "unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed." Okla. Stat. tit. 21, § 711(3) (2001). This crime takes place when a defendant was not the initial aggressor and honestly (but unreasonably) believed he or she was in physical danger or that killing was the only way to prevent injury. *Davis v. State*, 268 P.3d 86, 116 (Okla.Crim.App.2011).

### B. Our Standard for Evaluating this Claim

This issue involves two overlapping standards of review: (1) the standard for reviewing ineffectiveness claims, and (2) the standard for reviewing habeas claims under 28 U.S.C. § 2254(d)(1).

#### 1. Standard for Ineffective Assistance of Counsel

■ We review ineffectiveness claims under the two-part test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, parties claiming ineffective assistance of counsel must show that

- counsel's performance was objectively unreasonable and
- there was a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Reviewing courts may address the two parts of the test in any order, and failure to satisfy either part would preclude relief. *Id.; United States v. Watson*, 766 F.3d 1219, 1227 (10th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 735, 190 L.Ed.2d 459 (2014).

#### 2. Standard for Habeas Claims Under § 2254(d)(1)

The OCCA applied *Strickland* and concluded that trial counsel had not rendered ineffective representation. *Hancock v. State*, 155 P.3d 796, 821–22 (Okla.Crim. App.2007). Under federal law, we must defer to that decision unless Mr. Hancock shows that such deference is unwarranted. *See* 28 U.S.C. § 2254(d) (2012).

■ Mr. Hancock invokes 28 U.S.C. § 2254(d)(1), arguing that deference is unwarranted because the OCCA based its decision on an unreasonable application of *Strickland*. To be "unreasonable," an application cannot merely be wrong; instead, it must be so wrong that all fair-minded jurists would agree that the application is incorrect. *Frost v. Pryor*, 749 F.3d 1212, 1215 (10th Cir.2014).

To prevail on the ineffective assistance claim, Mr. Hancock had to show that all fair-minded jurists would agree that (1) trial counsel's performance was objectively deficient, and (2) there was a "reasonable likelihood" that the jury would have found guilt on manslaughter while resisting a criminal attempt—rather than first-degree murder—if defense counsel had asked for the instruction. *See id.* at 1225–26 (analyzing the *Strickland* test through the AEDPA standard).

### C. Application of the Standard

■ Applying the standards under *Strickland* and the AEDPA, we conclude that the OCCA reasonably applied Supreme Court precedent. We can assume, for argument's sake, that trial counsel's

performance was deficient. But even then, Mr. Hancock has not shown that all fair-minded jurists would agree that the deficiency was prejudicial.

The jury not only found guilt on the charge of first-degree murder, but also rejected the opportunity to find guilt on the lesser-included offense of heat-of-passion manslaughter. Mr. Hancock argues that his theory matches the omitted theory (manslaughter while resisting a criminal attempt) more closely than the theory presented (heat-of-passion manslaughter). But the OCCA could reasonably have disagreed with this assessment.

### 1. Heat–of–Passion Manslaughter

Under Oklahoma law, heat-of-passion manslaughter exists when

- there is "adequate provocation;"
- the defendant experiences "a passion or an emotion such as fear, terror, anger, or resentment;"
- "the homicide occurred while the passion still existed, and before there was reasonable opportunity for the passion to cool;" and
- "there was a causal connection between the provocation, the passion[,] and the homicide."

Crim.App. Orig. R., vol. VII, at 1208; OUJI—CR 4–97, Vernon's Okla. Forms 2d (West 2001). Reasonable jurists could conclude that the evidence aligned with these elements for the murders of both Mr. Jett and Mr. Lynch.

### 2. Mr. Jett

A fair-minded jurist could reasonably conclude that Mr. Hancock's account of the Jett killing fit a theory of heat-of-passion manslaughter more closely than a theory of manslaughter while resisting a criminal attempt. Mr. Hancock told the police that he had followed Mr. Jett into the backyard because his "adrenaline was pumping."

Trial Tr., vol. VIII, at 77. That explanation would suggest that Mr. Hancock pursued Mr. Jett after he had become angry or fearful, without enough time for his emotions to subside.

 In contrast, the crime of manslaughter while resisting a criminal attempt requires that a defendant have an honest yet unreasonable belief he is in danger. *Davis v. State*, 268 P.3d 86, 116 (Okla.Crim.App.2011). For the sake of argument, we can assume that Mr. Hancock's adrenaline explanation could fit that crime. But even then, the OCCA could reasonably conclude that Mr. Hancock's adrenaline explanation had fit the heat-of-passion instruction more closely than it would have fit the criminal attempt instruction.

### 3. Mr. Lynch

Fair-minded jurists could also conclude that the heat-of-passion instruction neatly fit Mr. Hancock's account of the murder of Mr. Lynch. When shooting Mr. Lynch, Mr. Hancock had already been attacked by Mr. Jett and told to get into a cage. Fair-minded jurors could reasonably (1) attribute Mr. Hancock's reaction to his rage rather than an honest belief that he had to defend himself against Mr. Lynch, and (2) regard Mr. Hancock's version more consistent with a theory of heat-of-passion manslaughter than a theory of manslaughter while resisting a criminal attempt.

### 4. Summary

For these reasons, we conclude that Mr. Hancock has not shown that the OCCA unreasonably applied Supreme Court precedent when rejecting the ineffective-assistance claim.

## VII. Cumulative Error

Mr. Hancock also urges cumulative error. We conclude that Mr. Hancock is not entitled to habeas relief on this ground.

■ In some circumstances, trial errors might in isolation be insignificant, but collectively be serious enough to deprive the defendant of fundamental fairness. When that happens, the defendant may obtain relief on the basis of cumulative error. *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir.2013).

We can consider two types of errors:
- errors that violated the federal constitution [15] and
- deficiencies of counsel that would have constituted ineffective assistance but for the absence of prejudice.[16]

We have not found any constitutional errors, but we have rejected Mr. Hancock's ineffective-assistance claim based on the lack of prejudice. Though we did not decide whether the defense attorneys were deficient, we may assume for the sake of argument that they were. With this assumption, we would be left with only one error: trial counsel's failure to ask for an instruction on manslaughter by resisting a criminal attempt. We held above that Mr. Hancock has not shown a reasonable probability of a different result if counsel had asked for the instruction. *See* pp. 1023–25, above. There are no other errors to aggregate with this error on the part of counsel. As a result, we cannot grant habeas relief on the basis of cumulative error.[17]

## VIII. Motion to Expand the Certificate of Appealability

Mr. Hancock asks us to add four issues in the certificate of appealability:

1. the sufficiency of the evidence for a conviction on first-degree murder,

2. the exclusion of evidence relating to self-defense,

3. the ineffectiveness of trial counsel for failing to impeach Ms. Tarp's testimony and the ineffectiveness of appellate counsel for failing to assert ineffectiveness of trial counsel, and

4. the sufficiency of the evidence to support the aggravating circumstance of heinousness, atrocity, or cruelty.

We deny Mr. Hancock's request to issue a certificate of appealability on these issues.

### A. Standard for a Certificate of Appealability

■ Expansion of the certificate of appealability is merited upon a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). In applying this standard, we defer under the AEDPA to the OCCA's decision on the merits. *Okyere v. Rudek,* 732 F.3d 1148, 1149 (10th Cir.2013).

### B. Sufficiency of the Evidence: First–Degree Murder

The jury found Mr. Hancock guilty of first-degree murder, which required sufficient evidence to reject Mr. Hancock's assertion of self-defense. *See Hancock v.*

15. *Littlejohn v. Trammell,* 704 F.3d 817, 868 (10th Cir.2013).

16. *Cargle v. Mullin,* 317 F.3d 1196, 1207 (10th Cir.2003).

17. The respondent argues that we cannot entertain the claim because the Supreme Court has not recognized constitutional protection against cumulative error. Similar arguments

have divided the circuits, and we need not weigh in on that circuit split. *See Hooks v. Workman,* 689 F.3d 1148, 1194 n. 24 (10th Cir.2012) (discussing the circuit split). Even if the Supreme Court has recognized a constitutional protection from cumulative error, we would need to reject the claim based on the absence of two or more errors to aggregate. *Thacker v. Workman,* 678 F.3d 820, 849 (10th Cir.2012).

*State,* 155 P.3d 796, 812 (Okla.Crim.App. 2007). Mr. Hancock challenges the sufficiency of that evidence.

### 1. Unreasonable Application of Federal Law

The OCCA concluded that the evidence was sufficient for a reasonable jury to find that Mr. Hancock had not acted in self-defense. *Hancock v. State,* 155 P.3d 796, 810–813 (Okla.Crim.App.2007). The federal district court reviewed the OCCA's conclusion, determining that Mr. Hancock had failed to show an unreasonable application of Supreme Court precedent. *Hancock v. Workman,* No. 5:08–cv–327–F, at 27–28 (W.D. Okla. filed Feb. 3, 2009) (unpublished).

Mr. Hancock argues that the OCCA misinterpreted federal law when it evaluated the evidence because the OCCA treated the jury verdict as unassailable. We conclude the district court's decision to the contrary is not reasonably debatable.

In evaluating the sufficiency of the evidence, the OCCA relied on the test articulated in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Compare Hancock,* 155 P.3d at 811, *with Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (using similar language). In light of this reliance, we could entertain the merits of the claim on appeal only if the OCCA unreasonably applied the *Jackson* standard. *Diestel v. Hines,* 506 F.3d 1249, 1267 (10th Cir.2007).

Under *Jackson,* the OCCA had to decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. Any rational jurist would conclude that the OCCA reasonably applied the *Jackson* standard.

The OCCA stated the standard as it had been established in *Jackson. Hancock v. State,* 155 P.3d 796, 811 (Okla.Crim.App. 2007). Applying this standard, the court concluded that a rational jury could have found Mr. Hancock guilty of first-degree murder. *Id.* at 811–12. The district court concluded that the OCCA had reasonably applied this standard and that the evidence was sufficient for a finding of guilt. *Hancock v. Workman,* No. 5:08–cv–327–F, at 27–28 (W.D. Okla. filed Feb. 3, 2009) (unpublished). In our view, no reasonable jurist could question the reasonableness of the district court's conclusion.

### 2. Mischaracterization of the Facts

Mr. Hancock also argues that the OCCA mischaracterized the facts when concluding that the evidence sufficed for a finding of first-degree murder. The district court concluded that this challenge was meritless. *Id.* at 26. For this argument, Mr. Hancock points to his version of events. But the jury was free to reject that version. *See United States v. Evans,* 318 F.3d 1011, 1018 (10th Cir.2003).

Viewing the evidence in the light most favorable to the government, the jury could have rejected Mr. Hancock's theory of self-defense. Even though Mr. Jett was the initial aggressor, Mr. Hancock could not prevail on self-defense if he continued the altercation or restarted the fight after Mr. Jett had withdrawn. *See Allen v. State* 871 P.2d 79, 92 (Okla.Crim.App. 1994). And we have already explained why a jury could reasonably conclude that Mr. Hancock had willingly joined the fight. *See* pp. 1018–20, above (analyzing why a jury could conclude Mr. Hancock had willingly joined the fight in the context of the jury instructions on mutual combat).

### 3. Summary

The district court concluded that the OCCA had reasonably applied Su-

preme Court precedent and determined the facts. *Hancock v. Workman,* No. 5:08–cv–327–F, at 26–28 (W.D. Okla. filed Feb. 3, 2009) (unpublished). No reasonable jurist could find these conclusions debatable or wrong.

## C. Exclusion of Evidence on Self–Defense

The state district court excluded two categories of evidence:

1. evidence that the victims were members of dangerous motorcycle gangs, and

2. complete recordings of the two police interrogations of Mr. Hancock.

Mr. Hancock maintains that these rulings deprived him of due process. The OCCA and the federal district court rejected this argument. *Hancock v. State,* 155 P.3d 796, 817–18 (Okla.Crim.App.2007); *Hancock v. Workman,* No. 5:08–cv–327–F, at 39, 41–42 (W.D. Okla. filed Feb. 3, 2009) (unpublished). No reasonable jurist would regard that determination as debatable or wrong.

### 1. The Right to Due Process

 Due process includes a defendant's right to present a theory of defense. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In some cases, this right requires the court to allow evidence that would otherwise be inadmissible. *Id.* But a defendant is entitled to introduction of this evidence only if it is reliable and exclusion would significantly undermine the fundamental elements of the defense. *Morris v. Burnett,* 319 F.3d 1254, 1272 (10th Cir.2003). Otherwise, the traditional rules of evidence apply. *Id.*

### 2. Gang Membership

 Mr. Hancock offered evidence of the victims' gang membership to explain why he (1) feared Mr. Jett and Mr. Lynch and (2) fled after the killings. The state district court excluded the specific reference to the gang affiliation, but allowed some evidence referring to the victims' affiliations with biker gangs. From that evidence, the jury learned four facts relating to the victims:

1. Mr. Jett distributed methamphetamine.

2. Mr. Jett carried a pistol and wore a leather motorcycle vest.

3. Both victims were bikers, and Mr. Hancock feared retaliation from bikers after seeing Mr. Lynch's brother on television, vowing to retaliate against Mr. Lynch's killer.

4. Mr. Hancock feared the victims' associates, who were members of the Rogues, Hangmen, and Banditos gangs.

The OCCA concluded that the evidence had sufficiently explained Mr. Hancock's fear and his flight. *Hancock v. State,* 155 P.3d 796, 817 (Okla.Crim.App.2007). The federal district court agreed. *Hancock v. Workman,* No. 5:08–cv–327–F, at 40 (W.D. Okla. filed Feb. 3, 2009) (unpublished).

Mr. Hancock argues that the OCCA's conclusion involved an unreasonable interpretation of the record. In Mr. Hancock's view, the trial evidence did not show (1) involvement with violent outlaw motorcycle gangs or (2) his knowledge of those affiliations.

For the sake of argument, we can assume that Mr. Hancock's proposed evidence related to his fundamental right to present a defense. But any reasonable jurist would recognize the existence of other evidence presented on this defense. For example, Mr. Hancock testified that (1) he was afraid of the victims' associates and (2) those associates belonged to specific biker gangs. Thus, no reasonable jurist

could disagree with the district court's conclusion that the OCCA reasonably interpreted the record.

### 3. Recorded Interviews

On two occasions, Mr. Hancock gave recorded interviews to the police. During cross-examination, the prosecution used portions of the interview transcripts to impeach Mr. Hancock. On redirect, Mr. Hancock's counsel tried to present the complete recordings of the interviews. The state district court excluded the complete recordings, but allowed Mr. Hancock's counsel to use the transcripts to point to prior consistent statements.

On appeal, Mr. Hancock argued that the district court's failure to admit the recordings had constituted denial of the right to present a defense because

- the recordings would have revealed "the interrogating officers' extensive comments about the victims' violent reputations" and
- the recordings "would have rebutted the prosecution's attack on his credibility."

Am. Mot. to Expand the Certificate of Appealability at 17. Because Mr. Hancock's counsel had an opportunity to present prior consistent statements, the OCCA concluded that exclusion of the complete recordings had not resulted in prejudice or an abuse of discretion. *Hancock v. State,* 155 P.3d 796, 818 (Okla.Crim.App.2007). The federal district court determined that the OCCA's conclusion involved a reasonable application of Supreme Court precedent. *Hancock v. Workman,* No. 5:08–cv–327–F, at 39 (W.D. Okla. filed Feb. 3, 2009) (unpublished).

At this stage, it is unclear whether Mr. Hancock is arguing that the OCCA's conclusion involved a misapplication of federal law, a misreading of the record, or both. Whatever the argument is, we do not believe jurists could regard the district court's decision as reasonably debatable.

#### a. The Victims' Violent·Reputations

Any reasonable jurist would reject the challenge with respect to the victims' violent reputations because Mr. Hancock had no constitutional right to present any additional evidence regarding the victims' gang affiliations. *See* pp. 1027–28, above. Thus, we need not consider whether Mr. Hancock was constitutionally entitled to introduce this specific piece of evidence.

#### b. Rebuttal of Credibility Attacks

Mr. Hancock's challenge based on the recordings' potential for rehabilitation fails for two reasons, one legal and one factual.

■ Legally, for exclusion of the evidence to violate Mr. Hancock's right to due process, the exclusion must have significantly undermined the fundamental elements of his defense. *See id.* at pp. 1026–27, above. Mr. Hancock's counsel attempted to admit the recordings to bolster Mr. Hancock's credibility. At trial, counsel argued the recordings were admissible because

- the prosecution had already introduced parts of the interview, which entitled the defense to introduce the rest of the interview, and
- the recordings supplied context for the statements, showing that the police (1) had interrupted Mr. Hancock so that he could not fully explain his narrative, and (2) had not disclosed "the entire scenario of [the] interviews."

Trial Tr., vol. VIII, at 85.

■ Exclusion of the recordings did not result in a denial of due process. The full recordings provide the context of Mr. Hancock's statements and show that Mr. Hancock was interrupted. But the inabili-

ty to use the full recordings did not interfere with Mr. Hancock's fundamental right to present a defense.

At trial, Mr. Hancock offered the evidence solely to rebut the attacks on his credibility. *See* Trial Tr., vol. VIII, pp. 85–86 (statements from defense counsel that the recordings were admissible to provide context for Mr. Hancock's statements in cross-examination).[18] Thus, even without the desired boost to his credibility, Mr. Hancock was able to present his version of events and his defense. *See United States v. Scheffer,* 523 U.S. 303, 317, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (holding that the defendant was able to present his defense when the defendant was prevented from using evidence that would have bolstered his credibility).

In the absence of a constitutional requirement to admit the evidence, the state's evidence rules applied. *See Morris v. Burnett,* 319 F.3d 1254, 1275–78 (10th Cir.2003) (applying state evidence rules in the absence of a constitutional requirement). Therefore, no reasonable jurist would credit the legal underpinnings of Mr. Hancock's due-process claim.

Factually, the recordings would not have shown Mr. Hancock's inability to give his version of events. In the recorded interviews, Mr. Hancock told his version numerous times. The police sometimes interrupted Mr. Hancock to ask him a specific question or to direct him to another part of the events. But there were far more instances in which Mr. Hancock gave his entire account without interruption. As a result, Mr. Hancock's argument fails on factual grounds.

In light of the legal and factual shortcomings in Mr. Hancock's due-process claim, no rational jurist could regard the district court's disposition of this claim as reasonably debatable.

### D. Ineffective Assistance of Trial Counsel

Before trial, Ms. Tarp said three times that Mr. Jett had hit Mr. Hancock with the bar. But at trial, Ms. Tarp modified this part of her account, saying that she was unsure whether Mr. Jett had (1) actually hit Mr. Hancock with the bar, or (2) just swung it at him. Mr. Hancock argues that his trial counsel was ineffective for failing to adequately impeach Ms. Tarp.

The *Strickland* standard applies. Under *Strickland,* Mr. Hancock must show that (1) counsel provided legal representation that was objectively unreasonable, and (2) the deficiency was prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052 (1984); *see* p. 1023, above. The federal district court concluded that Mr. Hancock had failed to make this showing. *Hancock v. Workman,* No. 5:08–cv–327–F, at 102 (W.D. Okla. filed Feb. 3, 2009) (unpublished).

Any reasonable jurist would conclude that Mr. Hancock was not prejudiced by the way that his trial counsel cross-exam-

---

**18.** At trial, defense counsel remarked that the police had not told Mr. Hancock "about the entire scenario of his interviews with the police." Trial Tr., vol. VIII, at 85. Defense counsel did not explain how this remark would make the full recordings admissible; and in the motion to expand the certificate of appealability, Mr. Hancock does not appear to rely on his attorney's remark about nondisclosure of the "entire scenario." But if Mr. Hancock were to rely on his attorney's re-

mark, the full recordings would not have helped. In the recordings, the police told Mr. Hancock that they worked with the District Attorney's office to present the facts and identified parts of Mr. Hancock's account that they regarded as inconsistent. And at the start of the second interview, the police told Mr. Hancock that charges had been filed. (discussing 28 U.S.C. § 2254(e)(1)). But unlike the majority, I conclude that Hancock has met his burden.

ined Ms. Tarp. That cross-examination showed that Ms. Tarp had changed her account:

Q: Did you—did you see any blood on Mr. Hancock after [Mr. Jett] was swinging the [break-over bar] around?

A: No.

Q: Did you—did you think it hurt?

A: Well, I imagine if he would have been hit with it, I would have either heard [Mr. Hancock] say something or something.

Q: Okay.

A: So my feelings—but if I think back on it now, I don't believe that he was hit with it because if he had, I'm sure that it would have been a reaction on [Mr. Hancock's] side, and he was just sitting there.

Q. Okay. Do you remember being asked—At Page 105, Line 18. "Okay. And then did you see when he hit the guy? Did it cause an injury? Was it bleeding or anything like that?" And you said: "I didn't see any blood, but I imagine it hurt."

A: Well, yeah, if he got hit by it. I don't know if he got hit by it or not. I didn't see any repercussions that he had been hit, but I imagine if somebody, anybody got hit on the side of the head with one of those, it would hurt.

Q: Well, you didn't say that you thought he was swinging it. You said *when* he hit him, in your answer that you gave under oath at the preliminary hearing in December of 2002.

A: Okay.

Q: Okay?

A: But I'm not sure if he hit him or he didn't hit him. It looked like he

was—he was close enough he could have hit him.

Trial Tr., vol. VI, pp. 231–32 (emphasis added).

■■■ Mr. Hancock's counsel could have also impeached Ms. Tarp with her two other prior statements. But in light of the existing impeachment, the additional statements would probably not have made a difference. Therefore, any reasonable jurist would agree with the district court's decision to reject the claim based on a lack of prejudice.

### E. Ineffective Assistance of Appellate Counsel

Mr. Hancock also contends that his appellate counsel was ineffective for failing to assert ineffectiveness of trial counsel. As discussed above, however, no rational jurist could regard trial counsel's cross-examination of Ms. Tarp as prejudicial. *See* pp. 1029–30, above. Because the cross-examination was not prejudicial, no reasonable jurist could fault appellate counsel for failing to assert ineffectiveness of trial counsel.

### F. Sufficiency of the Evidence for Heinousness, Atrocity, or Cruelty

■■■ Oklahoma law provides for a "heinous, atrocious, or cruel" aggravating circumstance for purposes of a death sentence. *Wilson v. Sirmons,* 536 F.3d 1064, 1105 (10th Cir.2008). The jury found the presence of this circumstance for the murders of Mr. Jett and Mr. Lynch. Mr. Hancock argues that the evidence was constitutionally insufficient for a finding of heinousness, atrocity, or cruelty.

■■■ For this circumstance, the jury had to find that there was proof of "torture or serious physical abuse." *Robinson v. State,* 900 P.2d 389, 400 (Okla.Crim.App. 1995). Serious physical abuse can be

shown by facts about the killing itself, the killer's attitude, and the victim's suffering. *Id.* Extreme mental cruelty will also satisfy the circumstance, and "[t]he length of time which the victim suffers mental anguish is irrelevant." *Berget v. State,* 824 P.2d 364, 373 (Okla.Crim.App.1991).

The OCCA concluded that the evidence was sufficient for a jury to find this aggravating circumstance, pointing out that

- Mr. Jett had been shot in four places, three resulting in painful injuries,
- Mr. Jett had run from his home to escape, but Mr. Hancock gave chase,
- Mr. Hancock had fired the final shots while Mr. Jett was on the ground in the backyard, moaning and writhing in pain,
- Mr. Lynch had suffered gunshot wounds to his face, hand, and lower chest,
- Mr. Lynch had seen his friend, Mr. Jett, being shot,
- Mr. Lynch had been unarmed and had not posed a threat to Mr. Hancock,
- Mr. Hancock had fired the last round at Mr. Lynch while he was lying wounded on the floor, and
- Mr. Jett had lingered for several minutes before dying.

*Hancock v. State,* 155 P.3d 796, 824 (Okla. Crim.App.2007). The federal district court concluded that the OCCA had applied the applicable law and reasonably found the aggravating circumstance. *Hancock v. Workman,* No. 5:08–cv–327–F, at 77 (W.D. Okla. filed Feb. 3, 2009) (unpublished). The district court's conclusion was not reasonably debatable.

■■■ A rational jury could find that these facts showed extreme mental anguish, if only for a short time. Both victims suffered because of their awareness of their impending deaths and their helplessness, and we have upheld a finding of the same aggravating circumstance under similar circumstances. *See Wilson v. Sirmons,* 536 F.3d 1064, 1105 (10th Cir.2008) (concluding that the OCCA reasonably applied *Jackson v. Virginia* in concluding that the victim's awareness of his pending murder could have led a reasonable factfinder to believe that the essential elements of the aggravating circumstance were satisfied beyond a reasonable doubt).

Mr. Hancock points to other Oklahoma cases to show inconsistency by the OCCA in its requirements for the aggravating circumstance. But our role is not to question the internal consistency of Oklahoma case law. *See* 28 U.S.C. § 2254(d) (2012). Rather, our role is to (1) identify the elements of the offense, and (2) determine whether the OCCA reasonably determined that a rational factfinder could find these elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). No reasonable jurist could credit Mr. Hancock's challenge.

**G. Summary**

The federal district court's disposition of the additional challenges is not reasonably debatable. Therefore, we deny the motion to expand the certificate of appealability.

**IX. Conclusion**

In summary, we affirm the district court's denial of habeas relief and deny Mr. Hancock's motion to expand the certificate of appealability.

LUCERO, Circuit Judge, dissenting.

I concur in all but Section IV(B) of the majority opinion, in which my esteemed colleagues hold that Hancock "has failed to prove that the OCCA's decision was based on an unreasonable determination of the facts." (Majority Op. 1016.) In so hold-

ing, my colleagues fail to credit Hancock's proof that the OCCA concluded that the trial court admitted the evidence under Okla. Stat. tit. 12 § 2609(B), when in fact the trial court expressly excluded the evidence under that section. My colleagues acknowledge that "[t]he OCCA did not tell us what it thought the district court had relied on to admit the evidence," (Majority Op. 1016), but they mistakenly read ambiguity into this silence. They fail to recognize that the only logically consistent reading of the OCCA decision is that it is improperly predicated on a misreading of the trial court decision.

This leaves a situation in which Hancock will be executed because the majority finds the OCCA ruling to be so confusing and ambiguous that my colleagues are unable to discern what the OCCA's factual determinations were. But judges of the OCCA are not pro se litigants whose "pleadings" must be construed liberally; they are experienced appellate jurists. AEDPA deference is meant to prevent federal judges from reversing state-court merits decisions based on mere disagreement. This purpose is not implicated when the grounds for a state court decision are so inscrutable that they cannot be identified with some degree of certitude.[1]

On my review of the record, I conclude that the state trial court admitted evidence of Hancock's 1982 manslaughter conviction and self-defense plea for impermissible reasons. On appeal, that evidentiary admission was nevertheless upheld by the OCCA based on its clear misapprehension of the trial court's rationale. Yet, according to today's majority, that misapprehension is unreviewable because the reasoning of the OCCA is exceptionally abstruse.

This seems to me little less than compounding of error, and compels my dissent.

## I

I agree with the majority that the OCCA made a decision on the merits when it reviewed the evidentiary ruling at issue for plain error. (Majority Op. 1011–12 (citing *Thornburg v. Mullin,* 422 F.3d 1113, 1124–25 (10th Cir.2005)).) I further agree that Hancock waived any argument that the evidentiary ruling constituted an unreasonable application of federal law. (*See id.* at 1016–17.) Accordingly, we may address the merits of his habeas claim de novo only if the OCCA's decision was "based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2). I agree that Hancock can meet his burden by proving that the OCCA plainly misapprehended or misstated the record. (Majority Op. 1011–12 (citing *Byrd v. Workman,* 645 F.3d 1159, 1171–72 (10th Cir.2011))); *accord Brumfield v. Cain,* —— U.S. ——, 135 S.Ct. 2269, 2276–77, 192 L.Ed.2d 356 (2015).

But I cannot agree that the decision of the OCCA is entitled to deference under § 2254(d)(2). The OCCA concluded that the trial court admitted Hancock's 1982 manslaughter conviction and self-defense plea under the Oklahoma rule for impeachment by a prior felony conviction, Okla. Stat. tit. 12, § 2609(B). My colleagues and I agree that conclusion is incorrect. Although the basis of the trial court's decision may have been unclear, what is clear is that the trial court ruled the evidence inadmissible under § 2609(B). In proceeding on the theory that the OCCA

---

1. I do not contest that the text of AEDPA unambiguously puts the burden on Hancock to prove that the OCCA made a mistake of fact. (*See* Majority Op. 1013 n.4. (discussing 28 U.S.C. § 2254(e)(1)).) But unlike the majority, I conclude that Hancock has met his burden.

might have affirmed the trial court on alternate grounds, the majority proceeds on a false premise. If the OCCA had in fact affirmed the trial court on alternate grounds, it would have said so, just as we do in our opinions. It did not do so. Q.E.D.—a false premise leads to an invalid conclusion, no matter the degree of rationalization.

## A.

Before trial, the state moved to admit evidence of Hancock's 1982 manslaughter conviction and self-defense plea under § 2404(B). Under § 2404(B),

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* The state argued that the evidence was admissible based on the "visible connection" between the 1982 manslaughter and the 2001 homicides, because "the defendant makes a claim of self-defense when he is caught committing a violent offense." After hearing argument on the motion, the trial court ruled that the evidence was inadmissible, but that the issue could be revisited if Hancock testified.

The state then shifted tactics and moved to admit the evidence under § 2609(B). Section 2609, titled "Impeachment by Evidence of Conviction of Crime," provides that "[e]vidence of a conviction ... is not admissible if a period of more than ten (10) years has elapsed since the date of ... the release of the witness from confinement imposed for that conviction ... unless the court determines ... that the probative value of the conviction ... substantially outweighs its prejudicial effect." *Id.* At a

subsequent hearing, the trial court deferred ruling on the motion until trial.

At trial, the issue resurfaced before Hancock testified. The trial court stated:

I advised you all of [sic] the past I didn't believe it was appropriate to *impeach* him with, per se, the manslaughter conviction. However, the state has indicated that they were interested in impeaching—not impeaching, but questioning about the fact that he—that he claimed self-defense before when he killed somebody and then is claiming self-defense again, and therefore he's well-versed in that—how that defense works, in essence, is my understanding of your wish to do that.

(Emphasis added.) This statement evidences confusion on the part of the trial court, which had earlier ruled that the 1982 manslaughter conviction was not admissible to show proof of knowledge under § 2404(B), but had deferred ruling on impeachment. If the purpose of admitting the 1982 manslaughter conviction was to prove Hancock's knowledge, then it should have been admitted as part of the state's case-in-chief, not after the state had rested and the defense was preparing to call Hancock as a witness.

Nevertheless, the prosecutor agreed that the 1982 manslaughter conviction was admissible only to show knowledge. But she said she "base[d]" her argument "on 2609." Co-counsel affirmed that they were discussing "impeachment through evidence of a prior conviction," and cited *Dyke v. State*, 716 P.2d 693, 699 (Okla.Crim.App. 1986), a case involving § 2609. Perplexingly, the state's theory of admissibility continued to change. In addition to the § 2404(B) and § 2609(B) theories, the state also argued that it would use the evidence to show "that [Hancock] offered this defense before, it's worked for [him]

successfully in the past because the jury has found [him] guilty of manslaughter and gave [him] the minimum sentence allowed by law." This theory fits neither § 2609(B) nor § 2404(B). Rather, this is a clear statement that the evidence was offered to show that Hancock acted in one way in the past, and thus had the propensity to act that way again in the future—a purpose plainly forbidden by § 2404(B).

After Hancock disputed the state's theories, the trial court issued its ruling. It first explained that "I noticed that [Hancock] uses legal phraseology when he talks to the police in describing his actions, in describing he was in fear of great bodily injury. He, in essence, quotes the statute back." This statement articulates why Hancock's 1982 self-defense plea might be admissible under the knowledge exception to § 2404(B). The trial court then explicitly ruled that the evidence "doesn't come in under the traditional impeachment by a prior conviction. It comes in under the fact that he's claimed that defense before and it was successful for him to a great degree and that he is claiming it again." This statement makes abundantly clear that the trial court *did not* admit the evidence under § 2609(B).[2] The stated rationale seems to match most closely the prosecutor's earlier argument for admissibility to show propensity, rather than knowledge. However, the trial court later instructed the jury that evidence of Hancock's past offenses was admitted "solely on the issue of the defendant's alleged ... knowledge." During closing argument, the state repeatedly told the jury that the 1982 manslaughter conviction was admissible only to show Hancock's knowledge of self-defense.

Given the trial court's apparent confusion, it is unsurprising that neither party argued on appeal that the evidence was admitted under any one section of the Oklahoma Evidence Code. Hancock argued that "the evidence was admitted under what amounts to a hybrid theory of Sections 2404 and 2609." Rather than defend the trial court's ruling under either § 2404(B) or § 2609(B), the state acknowledged that "the trial court's ruling on the admissibility of the defendant's prior manslaughter conviction does not appear to have relied on the Evidence Code," and that "the record does not reflect the specific law upon which the trial court rests her decision regarding this matter." The state attempted to defend the trial court's ruling as properly "relying upon common law principles and not a specific provision or combination of provisions from the Evidence Code."

Federal courts cannot grant habeas relief based on a state court's erroneous application of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). We thus need not definitively ascertain which section of the Oklahoma Evidence Code, if any, the trial court relied upon to admit the evidence of Hancock's 1982 manslaughter conviction and self-defense plea. Instead, we must determine if the OCCA made "an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2). To do so in this instance, we only need to know what theory the trial court *did not* rely upon to admit the evidence. The trial court was clear and firm on this point: "it *doesn't* come in under the traditional im-

---

**2.** The trial court also "recognize[d]" that the evidence was prejudicial, but concluded that it was "more probative." As the majority notes, such weighing sheds little light on the basis for the trial court's ruling, because it is required for evidence admitted under § 2404(B), § 2609(B), and the § 2402 residual exception for other relevant evidence. (*See* Majority Op. 1013.)

peachment by a prior conviction" rule. (Emphasis added.)

## B

Despite the trial court's explicit statement that the evidence was inadmissible under § 2609(B), the only reasonable interpretation of the state appellate court opinion is that the OCCA nevertheless based its opinion on the proposition that the trial court did admit the evidence under that section. Although the OCCA opinion is not easy to decipher, my colleagues err by concluding it can be plausibly interpreted in two ways.

In its March 9, 2007 opinion, the OCCA first explained that it proceeded on plain error review. *Hancock v. State*, 155 P.3d 796, 813–14 (Okla.Crim.App.2007).[3] It noted that the Oklahoma Evidence Code authorizes the admission of prior felony convictions under § 2609. *Hancock*, 155 P.3d at 814. In acknowledging that the parties had characterized the basis for the trial court's ruling in adversarial positions, the OCCA cast doubt on Hancock's "hybrid" theory, and rejected the state's common law theory, "because the Evidence Code itself sets the terms for admissibility of prior convictions in criminal cases." *Id.* It also stated that the trial court had initially rejected the state's motion to admit the evidence to show Hancock's knowledge un-

der § 2404(B). *Hancock*, 155 P.3d at 814. Although the OCCA did not explicitly say that the trial court admitted the 1982 manslaughter conviction and self-defense plea under § 2609(B), that conclusion is necessarily implied. The OCCA described § 2609 immediately before it rejected both Hancock's "hybrid" theory and the state's common law theory, and stated that the Evidence Code provided a basis for admissibility. It then acknowledged that the trial court had ruled the evidence inadmissible under § 2404(B). By process of elimination, the only section of the Evidence Code that the OCCA could possibly have concluded was the basis for the trial court's decision is the section that it actually cited at the beginning of its analysis— § 2609(B). The majority contends that "[t]here are many other sources of authority that the district court might have relied on." (Majority Op. 1014.) Yet the OCCA did not specify any other sources of authority, or hint that the trial court relied upon them. These omissions stand in sharp contrast to the voluminous textual and contextual evidence suggesting that the OCCA determined that the trial court admitted the evidence under § 2609(B).

Moreover, in its recitation of the events at trial, the OCCA explained that the state moved to admit the prior manslaughter conviction under § 2609(B) to

---

**3.** Hancock's trial counsel were unaware that they waived the issue of the admissibility of Hancock's 1982 manslaughter conviction and self-defense plea. They filed written objections to the state's motions to admit the evidence, argued against admissibility in several hearings, objected to the prosecutor's reference to facts underlying the 1982 conviction, and moved for a mistrial based on the admission of the evidence. The trial court repeatedly assured defense counsel that if they asked Hancock about the 1982 conviction on direct examination, they would not waive their right to appeal the decision to admit the evidence. But both Hancock's trial counsel

and the trial court were incorrect. As the OCCA explained, under Oklahoma law, defense counsel waived the error by broaching the issue on direct examination. *See Hancock*, 155 P.3d at 813–14 (quoting *Dodd v. State*, 100 P.3d 1017, 1039 (Okla.Crim.App. 2004)).

In both his direct appeal to the OCCA and in his habeas petition to the federal district court, Hancock alleged that his trial counsel were ineffective for broaching the issue on direct examination. Both courts denied his claim. *See Hancock*, 155 P.3d at 821. Hancock has not pursued a certificate of appealability on this issue.

impeach Hancock if he testified. *Hancock*, 155 P.3d at 814. The OCCA stated that the trial court's "subsequent instructions informed the jury Appellant's prior convictions were offered as impeachment evidence, to show that the defendant's testimony is not believable or truthful, and that [the] jury might consider it only to the extent that you determine it affects the believability of the defendant, if at all." *Id.* (citing Oklahoma Uniform Jury Instructions—Criminal 9–23 (2d ed.)) (quotations omitted). In referencing the jury instruction, the OCCA did not distinguish between the 1982 manslaughter conviction and Hancock's other convictions. The OCCA did not mention that the trial court also instructed the jury that evidence of Hancock's prior offenses should be considered only to prove knowledge. Later, the OCCA reiterated that the conviction was relevant to Hancock's credibility because he testified that he acted in self-defense. *Id.* at 815. Together, these statements further establish that the OCCA determined that the trial court admitted the evidence under § 2609(B).

> Finally, the OCCA held:
> Plain errors are violations of legal rules clear from the appellate record that go to the foundation of the case or take from the defendant a right essential to his defense. Despite the creative exchange of theories for and against the District Court's ruling, the State's manifest purpose in offering evidence of the prior conviction and Appellant's prior plea of self-defense was to attack the credibility of Appellant's current plea of self-defense. The record as a whole

shows the District Court weighed both the probative value of the evidence for this purpose and its prejudicial effect. Appellant's prior conviction and his plea of self-defense were directly relevant to his credibility as a witness, as they tended to show that Appellant had minimized his responsibility when prosecuted in a previous case and might do so again. We reject Appellant's argument that by admitting the evidence under the particular facts and circumstances here the District Court committed plain error going to the foundation of the case or taking from Appellant a right essential to his defense.

*Hancock*, 155 P.3d at 815 (quotations and citations omitted).

That the OCCA was conducting plain error review is significant. It belies the majority's suggestion that the OCCA conducted an independent analysis to conclude that the evidence was admissible under § 2609(B), and affirmed "because the result ... was correct even though the reasoning in the district court was wrong." (Majority Op. 1012.) Rather, the OCCA was evaluating *what the trial court did.* As the majority explains, the OCCA may perform quasi-de novo review through plain error analysis by analyzing whether an error is harmless. (*See id.* at 1014–15.) But the OCCA did not purport to do so. If the OCCA intended to conduct harmless error analysis, it would have said so.[4] Only a strained and implausible reading of the OCCA opinion suggests that "the OCCA could have considered what the trial court did and still relied on the [harm-

---

**4.** The majority concludes that the OCCA's failure to specify which prong of the plain error test it relied upon indicates only that "the OCCA wrote the opinion differently than we might have." (Majority Op. 1015 n.5.) I respectfully disagree. Because the OCCA was not explicit about the factual basis of its opin-

ion, I consider the context of the OCCA opinion for indicia of that factual basis. That context unambiguously indicates that the OCCA was analyzing what the trial court did, rather than conducting harmless error analysis.

less error] prong of the plain-error standard." (*Id.* at 1015.) The majority states that the OCCA might have determined that the trial court admitted the evidence under § 2403, and merely signaled approval of the trial court's § 2403 balancing. (*Id.* at 1015.) If this was true, one would expect the OCCA to at least reference § 2403 in the relevant portion of the opinion. No such reference exists. Yet the OCCA was clearly aware of § 2403; it discussed that provision just a few paragraphs later while addressing a different evidentiary argument. *Hancock*, 155 P.3d at 818. Reliance on § 2403 is a post-hoc justification, but the language used by the OCCA unambiguously shows that the court was reviewing what the trial court did, not conducting an independent analysis.

Notably, the OCCA stated that "[t]he record as a whole shows the District Court weighed both the probative value of the evidence *for this purpose* and its prejudicial effect," (emphasis added), referring to the state's intended purpose of impeachment. Although the trial court did weigh the probative value and prejudicial effect of admitting Hancock's 1982 manslaughter conviction and self-defense plea, it did so after definitively ruling the evidence inadmissible under § 2609(B). The OCCA

thus made an unreasonable determination of the facts by claiming that the trial court weighed the probative value of Hancock's 1982 manslaughter conviction "for this purpose"—the purpose of admitting the evidence under § 2609(B)—because the trial court did no such thing.[5]

Moreover, if the OCCA was conducting independent analysis to affirm the trial court because it reached the correct result for the wrong reason, as the majority suggests, then it would be necessary for the OCCA to address the prejudice stemming from the admission of the evidence.[6] Section 2609(B) only allows admission of convictions that are more than ten years old "if the probative value of the conviction ... *substantially* outweighs its prejudicial effect." (Emphasis added.) But the OCCA explained only why Hancock's 1982 manslaughter conviction was probative. It was entirely silent as to prejudice. It is true that both reviewing the decision of the trial court and conducting independent analysis would require the OCCA to address prejudice. (*See* Majority Op. 1015–16 n.7.) But the omission of the weightier part of the § 2609(B) test is more difficult to explain in the context of independent review than in a deferential review of whether the trial court erred. Thus, the omission lends further support to the plain

---

**5.** The majority distinguishes between impeaching the credibility of Hancock and impeaching the credibility of his self-defense plea. (Majority Op. 1016.) This is a distinction without a difference. Perhaps there is a situation in which the credibility of a plea could be attacked without also attacking the credibility of the person making the plea. But in this context, it was manifestly Hancock's credibility that was at issue. The trial court admitted the evidence only because Hancock himself testified. Discussion of the evidence before the trial court centered on Hancock's credibility. Nothing in the OCCA opinion indicates that Hancock's credibility is

in any way distinct from the credibility of his self-defense plea.

**6.** If the OCCA was conducting independent review to determine that the evidence was admissible under § 2609(B), I would also expect it to at least reference its own test for conducting that analysis. *See Croney v. State*, 748 P.2d 34, 37–38 (Okla.Crim.App.1987) (instructing courts to consider "the nature of the conviction itself," whether it has "some bearing on the accused's propensity to tell the truth," and "the similarity between the previous conviction and the present charge"). Yet the OCCA neither considered the applicable factors nor cited *Croney* or its progeny.

meaning of the OCCA opinion: that the court was reviewing what the trial court did, not conducting independent analysis.

The only sentence in the OCCA opinion that plausibly could be construed as independent analysis states that Hancock's "prior conviction and his plea of self-defense were directly relevant to his credibility as a witness, as they tended to show that Appellant had minimized his responsibility when prosecuted in a previous case and might do so again." *Hancock*, 155 P.3d at 815 (quotations omitted). This smacks of forbidden propensity evidence: because Hancock was prosecuted for homicide and claimed self-defense in 1982, he is more likely to kill and plead self-defense in the future. Yet the OCCA itself acknowledged that propensity evidence is inadmissible under § 2609. *See Hancock*, 155 P.3d at 815 ("Standing alone, the 1982 manslaughter conviction had no legal relevance to whether Appellant acted in self-defense in 2001.").

Ultimately, I cannot accept the majority's conclusion that the OCCA's opinion may plausibly be read as "affirming because the result (admission of the manslaughter conviction) was correct even though the reasoning in the district court was wrong." (Majority Op. 1012.) I readily acknowledge that "§ 2254(d)(2) requires that we accord the state ... court[s] substantial deference." *Brumfield*, 135 S.Ct. at 2277. But this "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Id.* (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). The abstruse and conclusory reasoning employed by the OCCA allows readers to project a range of more or less plausible interpretations onto the court's words. But if a state court can effectively suspend the Great Writ by writing opinions that are so confusing that they cannot be definitively read, the promise of due process of law would be hollow indeed. Rather than adopt a liberally construed (and, in my view, manifestly inaccurate) interpretation of what the OCCA may have meant, I propose instead we take the opinion at face value. Under that facial reading, the OCCA based its decision on an unreasonable determination of the facts in light of the evidence presented in the record. § 2254(d)(2).

## II

Because the OCCA's decision was based upon an unreasonable determination of the facts, I would review the merits of the issue de novo. *Magnan v. Trammell*, 719 F.3d 1159, 1175 (10th Cir.2013). On de novo review, I would conclude that the admission of Hancock's 1982 manslaughter conviction and self-defense plea rendered his trial fundamentally unfair, thereby violating his Fourteenth Amendment due process rights. *See Medina v. California*, 505 U.S. 437, 443–44, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). We do not apply or consider Oklahoma evidence rules in this analysis, but rather must determine whether admission of the evidence, "considered in light of the entire record ... resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir.2002). We "will not disturb a state court's admission of evidence of prior crimes, wrongs, or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies the defendant due process of law." *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998).

There is arguably some marginal probative value to Hancock's prior self-defense plea insofar as it shows that he knew about the existence of the defense of self-defense

when he killed Jett and Lynch. Such knowledge could have influenced the weight the jury gave his testimony. Before consulting with an attorney, Hancock apparently told police that he killed Jett and Lynch to prevent great bodily injury, showing his familiarity with the legal definition of self-defense. As the trial court remarked, "I noticed that he uses legal phraseology when he talks to the police in describing his actions, in describing he was in fear of great bodily injury. He, in essence, quotes the statute back."

But the probative value of Hancock's 1982 self-defense plea is extremely limited, because he could have learned about the legal definition of self-defense in many other ways. Self-defense is a concept so deeply rooted in our jurisprudence and social fabric that it has been a background assumption in not only the law, but also in popular culture, literature, and everyday conversations for centuries. *See, e.g.,* William Shakespeare, Hamlet act 5, sc. 1 ("How can that be, unless she drowned herself in her own defense?"). Anybody who watches Law & Order or reads Agatha Christie knows that self-defense is a defense to a murder charge. One would be hard-pressed to find many people who do *not* know this basic legal fact. To elicit this information from Hancock, the state needed only to have asked him if he knew about self-defense. There was no need to establish the basis of his knowledge, let alone that he had pled self-defense in the past.

Although there may have been vanishingly small probative value to Hancock's 1982 self-defense plea, I fail to see *any* probative value in Hancock's 1982 manslaughter conviction. The state claims that our decision in *United States v. Tan,* 254 F.3d 1204 (10th Cir.2001), makes all prior convictions for similar crimes probative. But *Tan* does nothing of the sort. In

*Tan,* we held that a defendant's seven prior driving-while-intoxicated convictions were properly admitted to prove malice in a second-degree murder trial. *Id.* at 1210–11. We reasoned that the prior convictions tended to show that the defendant knew driving while intoxicated could harm other people, and that he therefore had the mens rea necessary to commit murder when he drove intoxicated. *Id.* Far from creating a blanket rule that prior convictions for similar crimes are always relevant, *Tan* held that a specific type of prior conviction could be used to prove mens rea for a different charge. *Tan* does not make Hancock's 1982 manslaughter conviction relevant.

The state also claims support from *Welch v. Sirmons,* 451 F.3d 675 (10th Cir. 2006). In that case, the trial court admitted evidence that the defendant had previously committed a rape and murder in order to establish a common scheme or plan. *Id.* at 683. The previous rape and murder were similar to the rape and murder for which the defendant was on trial. *Id.* The OCCA affirmed, concluding that the evidence was more probative than prejudicial. *Id.* at 687. We denied Welch habeas relief because it was highly relevant that both murders and rapes bore similarly distinctive characteristics. *Id.* at 688. The same is not true of Hancock's prior conviction. There is little similarity between the homicides Hancock committed in 1982 and 2001. In 1982, Hancock brought a rifle to a park and used it to kill an unarmed man who had publicly humiliated him, after telling many people that he planned to kill the victim and asking around for a gun for several weeks. That is a manifestly different situation than the unarmed Hancock using Jett's gun to kill Jett and Lynch, against whom he bore no previous grudge. As we explained in *Welch,* this is a situation where the "minimal relevancy" of the prior conviction

"suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character." *Id.* at 685.

Weighing against this miniscule probative value is the immense prejudice flowing from Hancock's 1982 self-defense plea and manslaughter conviction. The entire case centered on the issue of whether the jury credited Hancock's testimony that he acted in self-defense or the state's theory that Jett withdrew, based on Shawn Tarp's testimony.[7] And the prosecution told the jury that they should not credit Hancock's word on the issue because he had pled self-defense before. Jurors could easily have inferred that the 1982 jury did not credit his self-defense plea because he was convicted of manslaughter, further damaging his credibility. Or they could have inferred that Hancock was a bad person whose self-defense plea was not credible because of a question the state asked Hancock on cross-examination: "You were violently attacked? A man leaned into your window and you shot him five times, that's a violent attack?" Improperly tipping the balance against the defendant on the core issue in a trial is the very definition of prejudice.

It is true that the jury was repeatedly admonished that it was only to consider Hancock's self-defense plea as evidence of his knowledge. But "[n]o less an authority than the Supreme Court ... has said, '[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.'" *United States v. Medina–Copete,* 757 F.3d 1092, 1108 n. 5

(10th Cir.2014) (quoting *Burgett v. Texas,* 389 U.S. 109, 115 n. 7, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967)). The presumption that juries follow their instructions is rebuttable, and is "rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation...." *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

In this case, any presumption that the limiting instructions cured the defect is rebutted by the sheer frequency with which the state discussed the instruction. During closing arguments, the state discussed Hancock's 1982 self-defense plea, manslaughter conviction, and knowledge of self-defense no fewer than six times. The state urged the jury to "[r]ecall back, 1982, he's convicted of manslaughter, and he proudly told you he served two years of that four-year sentence ... [but] don't consider that manslaughter. We don't want to you [sic] consider that manslaughter and say, you know what, he did it before, he's done it again." When reminding the jury to follow its instructions, the state again stated that "evidence has been introduced of the former conviction of the defendant, that 1982 manslaughter." The state discredited Hancock's statement to the police by reminding the jury to "keep in mind, when he's talking to the police, he knows what he has to set up for self-defense, because he's done it before, in 1982." During its rebuttal argument, the state reminded the jury that "it is not our intent for you to decide that the defendant committed Murder in the First Degree by

---

7. As such, I reject the state's argument that any error in admitting evidence of the 1982 self-defense plea and manslaughter conviction was harmless. *See Webber v. Scott,* 390 F.3d 1169, 1177 (10th Cir.2004) (concluding that due process violations reviewed de novo in a habeas case can be considered harmless er-

ror). All parties recognized from the outset that, because the case turned on whether the jury credited Hancock's or Tarp's testimony, there was a very real possibility that a jury might convict Hancock based on his past crimes, rather than what happened in 2001.

malice aforethought because he was convicted previous [sic] in 1982 for manslaughter." The prosecution waved Hancock's 1982 manslaughter conviction and self-defense plea in the jury's face so many times that, even with the caveat that it was only to be considered as evidence of knowledge, the prejudicial impact is clear. There is a limit to the frequency with which a jury can be told "don't think of an elephant" before we can but assume that the jury was being asked, with a wink and a nod, to think of an elephant.

Moreover, not all of the state's references to the challenged evidence were limited to the theory that it proved his knowledge of self-defense. The state spun its knowledge theory into a propensity argument when it told the jury: "In 1982, when he's convicted of that manslaughter, he puts up the same defense. He knows what to do this time around." It told the jury that Hancock was less credible than Tarp because of the manslaughter: "[R]emember, in order to not believe Smokey, you have to believe the defendant. . . . Who is the eight-time—seven-time convicted felon? Who knows what a defense of self-defense entails?" The prosecutor specifically highlighted Hancock's manslaughter conviction to show that he was a convicted felon, and therefore not credible. The state also used the conviction to prove an element of the felon-in-possession of a firearm charge, even though Hancock had committed other felonies that were admissible to prove the same element.

Perhaps seeking to prevent the jury from accepting the state's invitation to convict Hancock based on the events of 1982, Hancock's counsel opened his closing argument by telling the jury, "what really I'm afraid of the most in this case . . . [i]s Phillip Hancock's lifestyle, his prior convictions." It was as obvious to defense counsel at the time of Hancock's trial as it is today that there was a significant risk the jury would convict Hancock and discredit his self-defense plea because of what happened in 1982.

The details of the 1982 incident were the first thing the state presented to the jury during the sentencing phase of Hancock's trial. The state called multiple witnesses, who testified at length about the 1982 incident, and showed the jury pictures of the victim covered in blood. Although such evidence was permissible during the sentencing phase to prove the continuing threat aggravator, it crystallizes just how prejudicial evidence about the 1982 manslaughter conviction was when introduced and discussed extensively during the guilt phase of Hancock's trial.

I would therefore conclude that this is the rare case in which the probative value of the evidence is "greatly outweighed" by its prejudice, such that Hancock's right to due process of law has been violated. *Duvall*, 139 F.3d at 787. Despite the prosecution's repeated admonitions—and in part because they were so frequent—there can be no doubt but that prejudice occurred and that the jury convicted Hancock on a theory grounded on his past conviction and his asserted propensity to kill and then claim self-defense. The entire trial came down to whether the jury believed Hancock or Tarp about whether Jett retreated. And the prosecution used both Hancock's prior self-defense plea and his 1982 manslaughter conviction to tell the jury that Hancock was not to be believed. Thus, the prejudice stemming from the admission of Hancock's prior crime and plea went to the heart of the trial.

### III

I would **REVERSE.**