**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RESON LEE WOODS and SHAUN K. WOODS,

      Plaintiff Counter
      Defendants - Appellees/
      Cross - Appellants,

v.

FIRST NATIONAL BANK OF DURANGO, a chartered National Bank,

      Defendant
      Counterclaimant -
      Appellant/Cross - Appellee.

Nos. 15-1491 & 15-1492
(D.C. No. 1:11-CV-02676-WYD-CBS)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **MORITZ**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Reson and Shaun Woods submitted a single loan application to the First National Bank of Durango to finance a construction project. The application envisioned (1) a $480,000 construction loan for 18 months, and (2) a $482,000 First National in-house mortgage, known as a permanent take-out loan. Shortly thereafter, the Woodses closed on the $480,000 construction loan. They were tentatively approved for the permanent take-out loan subject to re-verification of all loan parameters. More than a year after their initial application, the Woodses re-applied for the permanent take-out loan to re-finance the construction loan. First National denied the loan and issued a written adverse action notice informing the Woodses of the decision. The Woodses filed a complaint alleging First National failed to comply with notice requirements set forth in the Equal Credit Opportunity Act (ECOA) when it failed to send an adverse action notice closer to the date of the Woodses' initial loan application.

The case went to trial, where the jury found in favor of First National's claim that it had complied with ECOA's notice requirements. The district court thus entered judgment against the Woodses and in favor of First National. The Woodses then filed a motion to alter or amend judgment, or in the alternative, for a new trial, arguing it was impossible to reconcile the jury verdict with the uncontroverted evidence presented at trial. The district court denied the motion.

The Woodses appeal, challenging both the underlying jury verdict and an evidentiary ruling by the district court concerning a handwritten reverification

approval condition on an internal First National credit approval memorandum for the permanent take-out loan. First National cross-appeals from the district court's denial of its post-trial motion for attorneys' fees.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm on all issues.

## I. Background

On March 6, 2008, the Woodses signed and submitted a single loan application to First National, seeking (1) a $480,000 construction loan for 18 months, and (2) a $482,000 First National permanent take-out loan.[1] A loan officer signed the application on March 10, 2008, and the application was transferred to the First National Loan Committee for consideration.

According to an internal First National credit approval memorandum, the Woodses were approved for the construction loan on April 8, 2008, on the condition that no more than $340,000 would be funded until closing on the sale of a specified property the Woodses owned. The parties closed on the construction loan on April 15, 2008, at which time they executed documentation, including a side letter agreement confirming the approval condition. According to another

---

[1] First National argues the jury could have reasonably found the Woodses did not submit an application for the permanent take-out loan in March 2008 when they submitted their application for the construction loan. We disagree. The weight of the evidence introduced at trial—including internal bank documents and testimony by First National employees—shows that First National considered the March 2008 application as one for both a construction loan and a permanent take-out loan. Whether that application was complete as to the permanent take-out loan, however, is a separate issue.

internal bank memorandum, on April 8 the Woodses were also approved for a permanent take-out loan subject to "re-verification of all loan parameters including income, assets, credit, appraisal (final)." App. 687. This condition was handwritten on the memorandum form.

After the April 15, 2008 closing on the construction loan, there were several communications between the parties, including:

- an e-mail sent on March 16, 2009 suggesting First National was unable to pursue the mortgage-loan request at the time and encouraging the Woodses to seek other options;

- a letter sent on April 3, 2009 suggesting First National would not be able to provide permanent financing for the maturing construction loan, encouraging the Woodses to seek other options, and asking for the Woodses' approval to release information requested by a different mortgage company;

- an e-mail sent on April 6, 2009 following up on the April 3 letter;

- a letter sent on May 29, 2009, acknowledging the Woodses' ongoing search for a permanent mortgage; and

- letters sent on June 30, July 17, and August 26, 2009 asking how the Woodses were progressing in securing a long-term mortgage.

On September 16, 2009, the Woodses signed and submitted another loan application to First National for a permanent take-out loan. This application

became complete on October 10, 2009 when the Woodses submitted required loan disclosure documents. On October 29, 2009, First National sent an adverse action notice to the Woodses denying the application.

In 2012, the Woodses filed a complaint alleging they had submitted a complete application for permanent take-out financing with their initial March 2008 application, and that First National had failed to issue an ECOA-compliant notification of its decision to deny that loan. Before trial, the Woodses filed a motion in limine seeking to exclude the handwritten reverification approval condition on First National's credit approval memorandum for the permanent take-out loan, which required reverification of all loan parameters before approval. The Woodses also sought to exclude any mention of the reverification condition at trial. The district court denied the motion.

At trial, the Woodses introduced the credit approval memorandum in unredacted form and elicited testimony about the handwritten approval condition. But when First National called the loan officer to testify about her discussion with the Woodses at the construction loan closing, the Woodses objected. Under the Colorado Statute of Frauds, the Woodses argued, an approval condition is a credit agreement which can only be enforced if it is in a writing signed by the person against whom enforcement is sought. The district court overruled the objection, but instructed the loan officer to limit her answer to what was on the credit approval memorandum. The loan officer then testified that approval of the

permanent loan was subject to reverification, and that she had informed the Woodses about this condition at the construction loan closing.

The jury ultimately found in favor of First National. In its completed verdict form, the jury found (1) the Woodses had submitted a completed application to First National for credit seeking a permanent take-out loan; (2) First National had taken an adverse action; and (3) First National had not failed to notify the Woodses in writing in conformity with the ECOA. The district court entered judgment against the Woodses and in favor of First National on the ECOA claim. The Woodses filed a timely Rule 59 motion to alter or amend judgment or, in the alternative, for a new trial, arguing it was impossible to reconcile the jury verdict with the uncontroverted evidence presented at trial. The district court denied the motion. The district court also denied First National's timely post-trial motion for attorneys' fees.

## II. Analysis

The Woodses challenge the district court's denial of their motion for post-trial relief and its admission of evidence concerning the reverification approval condition for the permanent take-out loan. First National challenges the district court's denial of its motion for attorneys' fees. For the reasons below, we affirm the district court in full.

### A. *The Woodses' Motion for Post-Trial Relief*

The Woodses contend the district court abused its discretion in denying their motion to alter or amend the judgment or for a new trial, arguing the jury's conclusion that First National complied with ECOA's notice requirements was contrary to the weight of the evidence. We disagree for two reasons: a motion to alter or amend is not available for claims that a verdict was against the weight of the evidence, and the jury's findings were not overwhelmingly against the weight of the evidence introduced at trial.

"We review denials of Rule 59(a) and Rule 59(e) motions for abuse of discretion." *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 657 (10th Cir. 2016). "A trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 770 F.3d 885, 899 (10th Cir. 2014) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997)).

As an initial matter, the Woodses' claim that the district court erred in denying their motion to alter or amend the judgment must fail. A court may grant a Rule 59(e) motion to alter or amend a judgment "only to correct manifest errors of law or to present newly discovered evidence." *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997) (quotation marks omitted)). We have previously held that a Rule 59(e) motion cannot be used to address the weight or

sufficiency of the evidence. *See Elm Ridge Exploration Co.*, 721 F.3d 1199, 1216 (10th Cir. 2013) (citing *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 n.1 (1st Cir. 1993)). Accordingly, the district court did not abuse its discretion in denying the Woodses' motion to alter or amend the judgment.

That leaves us with the Woodses' Rule 59(a) motion for a new trial. If a Rule 59(a) motion "asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009) (quoting *Anaeme v. Diagnostek*, 164 F.3d 1275, 1284 (10th Cir. 1999) (quotation marks omitted)).

The jury verdict found that First National was not liable under the ECOA, which requires creditors to notify applicants of any action taken on a completed application for credit within thirty days of receipt of the completed application. 15 U.S.C. § 1691(d)(1). The regulations define an application as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 202.9(f). When a creditor takes an adverse action[2] against an applicant, the applicant is entitled to a written statement of reasons or a written notification of

_____

[2] ECOA defines an adverse action as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6).

the applicant's right to obtain a written statement of reasons.  15 U.S.C. § 1691(d)(2).  The statement of reasons must contain "the specific reasons for the adverse action taken."  15 U.S.C. § 1691(d)(3).

Based on the evidence introduced at trial, a reasonable jury could have concluded First National complied with ECOA's notification requirements.  The jury heard evidence of two different loan applications for credit.  The first was dated March 6, 2008, and the second was dated September 16, 2009 and finalized on October 10, 2009.  First National sent an ECOA-compliant adverse action notice to the Woodses on October 29, 2009.  In its completed verdict form, the jury was not asked to (and thus did not) specify to which application it was referring.  But the jury could have been referring to First National's actions taken on the *second* loan application, and not to any actions taken regarding the March 6 loan application.  In light of this possibility, we cannot say the jury's conclusion was overwhelmingly contrary to the weight of the evidence.

To be sure, there was evidence in the record suggesting First National decided to deny the Woodses' initial application for the permanent take-out loan as early as August 2008 yet failed to issue an ECOA-compliant adverse action notice within thirty days.  Several First National employees testified that a bank employee made the decision not to extend permanent take-out financing at that time.  But the jury was never asked to decide *when* the adverse action occurred, nor was it asked to specify which loan application was the subject of that adverse

action. Perhaps if it had, then the Woodses might have been entitled to a new trial. But as written, the completed verdict form is not overwhelmingly against the weight of the evidence presented at trial. Perhaps the jury decided any decision in August 2008 was not an adverse action within the meaning of ECOA because the First National employee did not have final decision-making authority. Or, in light of the reverification condition on the credit approval memorandum for the permanent take-out loan, the jury could have reasonably concluded First National did not consider the Woodses' application for the take-out loan complete in August 2008.

In sum, a reasonable jury could have found any decision made in August 2008 was not an adverse action triggering ECOA's notice requirements, either because the Woodses' application was not complete as to the permanent take-out loan or because the First National employee's decision to deny the loan was not final. Put differently, although the jury could have found First National took an adverse action on the Woodses' March 6 application in August 2008, the evidence also supports the opposite conclusion. As the district court stated when it denied the Woodses' motion for a new trial, the jury was presented with two different narratives at trial. There was evidence supporting both versions of the case. Although a different jury might have accepted the Woodses' narrative instead, this possibility does not require a new trial.

Accordingly, we affirm the district court's denial of the Woodses' motion for post-trial relief.

### B. Admission of Testimony About the Reverification Approval Condition

The Woodses next argue the district court erred in admitting evidence concerning the reverification approval condition on the credit approval memorandum, because the condition was not in a writing signed by the Woodses. We reject this argument, because the Woodses invited any error that occurred.

"We review a trial court's decision to admit evidence for abuse of discretion." *Ryan Dev. Co., L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013). "A party may claim error in a ruling to admit . . . evidence only if the error affects a substantial right of the party and . . . a party, on the record" both (1) timely objects or moves to strike, and (2) states the specific ground for doing so. *See* Fed. R. Evid. 103(a).

"Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Vehicle Mkt. Res., Inc., v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1257 (10th Cir. 2016). That is, "the party introducing the evidence waives—rather than forfeits—any objection to its admission, meaning 'we do not consider the claim at all, even under the forgiving plain-error standard.'" *Id.* at 1258 (quoting *Hancock v. Trammell*, 798 F.3d 1002, 1011 n.3 (10th Cir. 2015), *cert. denied sub nom. Hancock v. Duckworth*, 137 S. Ct. 53 (2016)). We treat the objection as waived, because the party "invited the error

that it now seeks to challenge." *Vehicle Mkt. Res.*, 839 F.3d at 1258 (quoting *United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008)).

The Woodses admitted the unredacted credit approval memorandum— including the handwritten reverification approval condition—into evidence at trial. They also asked several witnesses to testify about the meaning of the reverification condition and its origin. The Woodses then objected when First National called the loan officer to testify about her conversations with the Woodses regarding the condition. But the Woodses had already questioned another witness about whether the Woodses had been made aware of the approval condition. On appeal, then, the Woodses are challenging a condition they created: they introduced the unredacted credit approval memorandum into evidence and made the memorandum and reverification approval condition central issues at trial. The Woodses have therefore waived any objection to the admission of evidence concerning the reverification approval condition on the credit approval memorandum. For that reason, we need not reach the parties' arguments about the Colorado Credit Agreement Statute of Frauds.

But even if we narrowly construed the Woodses' challenge as an objection to the loan officer's testimony *about* the reverification condition, their claim would still fail. The district court instructed the loan officer to limit her answer in a manner consistent with the unredacted credit approval memorandum. And although the Woodses contend they were "compelled" to introduce the

-12-

memorandum without contemporaneous objection, we have previously rejected similar arguments. *See, e.g.*, *Vehicle Mkt. Res.*, 839 F.3d at 1258 ("[A party] 'cannot avoid the consequence of its own trial tactic by arguing it was forced' by the district court's in limine ruling 'to introduce the evidence . . . .'") (quoting *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 904 (8th Cir. 2006)). In any event, the district court's pre-trial ruling on the motion in limine did not prevent the Woodses from objecting contemporaneously at trial. Indeed, the court expressly invited the parties to renew their objections to the challenged evidence during trial, and the Woodses failed to do so.

Accordingly, we affirm the district court's admission of evidence regarding the reverification approval condition in the credit approval memorandum.

## C. First National's Post-Trial Motion for Attorneys' Fees

In its cross-appeal, First National argues it is entitled to attorneys' fees. Specifically, First National claims the costs and expenses it incurred in defending the present ECOA action were incurred in connection with the enforcement of the parties' construction loan agreement, which contains an attorneys' fees and expenses provision. But First National reads this provision too broadly. We therefore affirm the district court's denial of First National's motion.

"We review for abuse of discretion the district court's denial of a motion for attorneys' fees under Federal Rule of Civil Procedure 54(d)(2)." *Vanguard Envtl., Inc. v. Kerin*, 528 F.3d 756, 758 (10th Cir. 2008). "Subsidiary factual

findings will only be reversed if clearly erroneous." *Iqbal v. Golf Course Superintendents Ass'n of Am.*, 900 F.2d 227, 228 (10th Cir. 1990).

Generally, a party seeking attorneys' fees under Federal Rule of Civil Procedure 54(d)(2) must specify the statute, rule, or other grounds entitling the party to the award. *See* Fed. R. Civ. P. 54(d)(2); *Vanguard Envtl.*, 528 F.3d at 758. Here, First National seeks attorneys' fees under the construction loan agreement. According to the attorneys' fees and expenses provision in the construction loan agreement, "[b]orrower agrees to pay all of Lender's reasonable costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement." Supp. App. 127. But the district court denied First National's motion because it concluded the provision in the construction loan agreement did not entitle First National to fees and expenses in this litigation, which did not involve enforcing the terms of the construction loan agreement.

We agree with the district court. First National incurred its litigation expenses defending against the Woodses' ECOA claim, which concerned a different loan and alleged agreement (i.e., for the permanent take-out loan), and not enforcement of the terms of the construction loan agreement. In an attempt to justify its broad interpretation of the fees provision in the construction loan agreement, First National argues the provision is not limited to direct claims for enforcement of the construction loan agreement, but rather extends broadly to any

-14-

fees incurred in connection with such enforcement. First National thus contends it would not have been successful in defending the ECOA claim unless the provisions of the construction loan agreement were enforced against the Woodses. In other words, because First National asserted the construction loan agreement as a defense, this case is covered by the fees provision. But enforcing the construction loan agreement was not necessary for First National to prevail. The construction loan agreement was only tangentially relevant as background to the main issue in the litigation, which involved the permanent take-out loan. First National's attorneys' fees and expenses therefore were not incurred in connection with the enforcement of the construction loan agreement.

## III. Conclusion

For these reasons, we AFFIRM the judgment of the district court in full.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Chief Judge

**Woods v. First National Bank of Durango**, Nos. 15-1491 and 15-1492, Bacharach, J., concurring in part and dissenting in part.

I respectfully concur in part and dissent in part. I join the majority in affirming the district court's denial of the Woodses' motion to alter or amend the judgment and First National Bank of Durango's motion for attorney fees. *See* Maj. Op. Parts II(A), (C). But I respectfully dissent regarding affirmance of the denial of the Woodses' motion for a new trial. *See* Maj. Op. Part II(A). On that ruling, I would reverse. As a result, I would decline to reach the Woodses' challenges on the evidentiary rulings. *See* Maj. Op. Part II(B).

\* \* \*

In Part II(A), the majority addresses a claim under the Equal Credit Opportunity Act. For this claim, the historical facts are largely undisputed. Mr. and Mrs. Woods applied in March 2008 for both a construction loan and a take-out loan. The construction loan would require repayment within eighteen months.

The Woodses knew that they could not repay the loan within eighteen months. But they could repay the loan if the bank approved the second of the requested loans. That loan was called a take-out loan and would permit repayment within 30 years. Approving the construction loan without approving the take-out loan would do the Woodses little except to require

the impossible: repayment of a loan in eighteen months without any possibility of avoiding a delinquency.

But that was precisely the dilemma thrust upon the Woodses. The bank quickly approved the construction loan and tentatively approved the take-out loan. Then, in August 2008, the bank internally decided to deny the take-out loan. But the bank declined to tell the Woodses that they would not get the take-out loan. The Woodses knew that they would need to repay the construction loan within eighteen months, but they did not know that the bank had denied the application for a take-out loan.

The bank waited until January 2009 to suggest to the Woodses that they might consider alternative financing. In April 2009, the bank decided that it might reconsider if the Woodses were to file a "new application." Appellants' App'x at 695. The Woodses filed a new application in September 2009, which became complete on October 10, 2009. The bank then rejected this new application.

The delay in denying the March 2008 application for a take-out loan created liability under the Equal Credit Opportunity Act. The jury's contrary decision is impossible to reconcile with existing law and the facts elicited at trial. Thus, in my view, the district court erred in denying the Woodses' motion for a new trial. Because the majority disagrees in Part II(A), I respectfully dissent on this part of the order and judgment.

2

## I. Standard of Review

In considering this ruling, we apply the abuse-of-discretion standard. *See Elm Ridge Exploration Co.*, 721 F.3d at 1216; *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005).

## II. The Undisputed Evidence of an Adverse Action Without the Required Notice

The Equal Credit Opportunity Act generally sets a 30-day time limit for a bank to notify a borrower of any adverse action taken on a completed loan application. 15 U.S.C. § 1691(d)(1)-(2); 12 C.F.R. § 202.9(a)(1). An application is "complete" if the bank "has received all the information that the [bank] regularly obtains and considers in evaluating applications for the amount and type of credit requested . . . ." 12 C.F.R. § 202.2(f). And the term "adverse action" refers to

> a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6).

Under these definitions, the bank would have been in violation of the Equal Credit Opportunity Act upon proof of four historical facts:

1. The Woodses applied for a take-out loan in March 2008.

3

2.      The bank took adverse action on the March 2008 application in August 2008.

3.      The application was complete at the time of the adverse action.[1]

4.      The bank did not notify the Woodses of the adverse action within 30 days of August 2008.

The bank denies violating the Act, arguing that the Woodses did not complete an application for a take-out loan in March 2008 and that there was no adverse action taken in August 2008. In addition, the bank argues that the verdict form was ambiguous and could have been referring to the second application (made in September 2009), which would not have resulted in a statutory violation.

In my view, however, the undisputed evidence showed the presence of each of the four historical facts. And even if the verdict form had been ambiguous, the district court should have granted the motion for a new trial because of the overwhelming evidence of a statutory violation.

## A.      The Woodses applied for a permanent take-out loan in March 2008.

The bank argues that a jury could reasonably have found that the Woodses did not apply for a take-out loan in March 2008. Appellee's Resp. Br. at 25-28. I disagree.

---

[1]      The Act's implementing regulations provide that even if a bank takes adverse action "on an incomplete application," the bank must provide notice of that action (subject to certain exceptions). 12 C.F.R. § 202.9(a)(1)(ii). The Woodses do not rely on this provision. Nor do I.

The bank points out that the Woodses' loan application in March 2008 contained multiple boxes. Two of these boxes referred to "Construction" and "Refinance" and were checked. Three other boxes said "Purchase," "Construction-Permanent" and "Other (explain)" and were not checked. Appellant's App'x at 676. Because the "Construction-Permanent" box was unchecked, the bank argues that a jury could reasonably find that the Woodses had not applied for a take-out loan in March 2008.

For two reasons, this argument cannot be reconciled with the evidence as a whole. First, shortly after the Woodses completed the application in March 2008, the bank generated internal documents unambiguously discussing the application as one for both a construction loan and a take-out loan. *Id*. at 132 ("Purpose: Construction loan"); *id.* at 138 ("Purpose: Permanent take-out for [First National Bank of Durango] construction loan"). Second, as discussed below, bank officials indisputably decided by August 2008 to deny the application for a take-out loan. How could bank officials have denied an application that didn't exist?

**B.    The bank took adverse action in August 2008 by denying the March 2008 application for a take-out loan.**

The bank denies that it took adverse action in August 2008 on the application for a take-out loan. This denial is based on two arguments. First, the bank argues that a jury could reasonably find that the bank had

5

not decided to deny the application for a take-out loan as early as August 2008. Second, the bank argues that any such denial would not constitute an adverse action because the Woodses were already delinquent on their construction loan.

In my view, both arguments fail as a matter of law. The undisputed evidence shows that the bank decided to deny the take-out loan in August 2008. And even if the Woodses were delinquent on the construction loan, the bank's denial of the application for a take-out loan would still constitute adverse action.

### 1. The bank denied the application for a take-out loan in August 2008.

The evidence overwhelmingly shows that the bank denied the application for a take-out loan in August 2008. In my view, a jury could not reasonably have found otherwise.

The decision-makers for the bank were Mr. Ronald Dunavant and Mr. Kent Curtis. Mr. Dunavant testified about the bank's August 2008 decision in the following exchanges:

Q:   After you became aware of these various problems, what did you do?

A.   The discussions with [Mr. Curtis], with discussions with the Woods[es] as we went along. Progress was made on the construction that w[as] going on, but we were aware that we would not be able to make a long-term permanent takeout so I encouraged them to find other financing to take that loan out when it was done.

6

Q.  About when did you make that decision?

A.  I believe that was in the August 2008 area.

Q.  And who made that decision?

A.  Kent Curtis.

Appellants' App'x at 554.

Q.  And [] you and Mr. Curtis, sometime in August 2008, determined that the First National Bank of Durango was not going to make the permanent loan, correct?

A.  I don't remember the timeline exactly, but that decision was made.

Q.  Well, at your deposition, did you say about four months in?

A.  Approximately, yes.

Q.  So am I in the right time frame?

A.  Fairly close, I think.

Q.  You can accept it as the time frame, then?

A.  I'll do my best.

Q.  No, I'm asking, can you accept it as the time frame four months in?

A.  I believe the record shows that, yes, sir.

Q.  So you are aware of what the time frame was, then?

A.  Close. Yes.

*Id.* at 591-92. `

7

Mr. Dunavant undoubtedly had the power to make this decision. He was a loan officer in charge of managing the Woodses' construction loan in 2008 and 2009. His direct supervisor was Mr. Curtis. As a practical matter, Mr. Dunavant and Mr. Curtis were in charge of making decisions about all of the Woodses' applications, including the first one for a take-out loan.

Ms. Melissa Zureich, the chief credit officer and executive vice president of the bank, acknowledged that the decision made by Mr. Dunavant and Mr. Curtis would constitute a decision by the bank itself:

> Q. Did you review Mr. Dunavant's testimony [in regard to his decision to deny the take-out loan]?
>
> A. I have.
>
> Q. And did you see that he stated: Mr. Curtis and I, in August of 2008, decided not to make this loan?
>
> A. I have read that.
>
> Q. And do you believe that to be true or untrue?
>
> A. I believe it to be true.
>
> Q. So as of August 2008, the bank had determined it was not going to be making the permanent loan; is that correct?
>
> A. According to that testimony, yes.
>
> Q. And you believe it to be true, right?
>
> A. Yes.

*Id.* at 329-30.

The bank does not question the fact that bank officials decided to deny the application for a take-out loan in August 2008. Instead, the bank points to its conditional approval of the take-out loan in April 2008, which stated that approval was conditional on "re-verification" of the information in the Woodses' loan application. It's true that the bank's documents referred to reverification. But there's also no question that bank officials had already decided in August 2008 to deny the application for a take-out loan.

As the bank points out, the Woodses submitted a new application for a take-out loan in September 2009. If that were the first application, the bank's notice of an adverse action would be considered timely. But no reasonable fact-finder could possibly regard the application for a take-out loan in September 2009 as the first application. More than a year earlier, bank officials had already decided to deny the Woodses' application for a take-out loan. The Woodses submitted the second application in September 2009 because that's what they were instructed to do. *See* Appellants' App'x at 695 (noting that the bank informed that Woodses that it had rejected the first take-out loan and that the bank would allow the Woodses to file a "new application").

The bank's references to "re-verification" or disposition on the second loan application in September 2009 do not wipe away what had taken place earlier. Thirteen months earlier, bank officials had already

9

decided to deny the Woodses' application for a take-out loan. Subsequent reverification and a new application could not undo that fact.

## 2. Any delinquency on the construction loan is irrelevant.

The bank also argues that any denial of the take-out loan would not constitute an adverse action because the Woodses were then delinquent on the construction loan. For this argument, the bank points out that "adverse action" "does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default." 15 U.S.C. § 1691(d)(6).

This argument is invalid as a matter of law. Like the statute, the regulations state that this affirmative defense applies when the action relates "to an account taken in connection with inactivity, default, or delinquency *as to that account*." 12 C.F.R. § 202.2(c)(2)(ii) (emphasis added).[2] Under the statute and regulations, the bank could avoid liability only if the Woodses had been delinquent on the take-out loan. But, the Woodses couldn't have been delinquent on that loan because it had never

---

[2] The regulation was adopted under a statutory delegation of authority to the Consumer Financial Protection Bureau. 15 U.S.C. § 1691b(a). This regulation would trigger substantial deference if the statute were ambiguous. *See Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 n.3 (7th Cir. 2004) (according substantial deference to 12 C.F.R. § 202.2(c)(1)(i)). We need not decide whether § 1691(d)(6) is ambiguous, for that section itself exempts bank action relating to "an existing credit arrangement," not a new loan application. 15 U.S.C. § 1691(d)(6).

been issued. The only loan issued was the construction loan, not the take-out loan.

The bank does not argue to the contrary. Instead, the bank contends only that the Woodses were delinquent on the construction loan. The problem is that the Woodses are not claiming that the bank took adverse action on the *construction loan*; their claim involves adverse action on the application for a *take-out loan*. Thus, the bank cannot avoid liability based on the Woodses' delinquency on the construction loan.

**C.** **The Woodses' March 2008 application for a take-out loan was complete when the application was denied.**

The bank argues that its action in August 2008 could be considered "adverse" only if the application for a take-out loan had been complete by that time. The bank points out that in April 2008, the bank provisionally approved the take-out loan subject to reverification. According to the bank, it asked the Woodses to submit the second application to allow this reverification. For the sake of argument, we may assume that the bank could not have taken an adverse action on the take-out loan unless that application had been complete by August 2008. Even with this assumption, there is no question that the application for a take-out loan was complete by August 2008.

The Equal Credit Opportunity Act's regulations state that a loan application is considered complete when the "creditor has received all the

11

information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested" from the applicant. 12 C.F.R. § 202.2(f).

Any reasonable jury would have to find that by August 2008, the bank had received all of the information that is regularly considered when evaluating loan applications. The bank does not deny that it had all the required materials in April 2008, when the bank provisionally approved the Woodses' application for a take-out loan; the bank said only that it would be reverifying the correctness of the information. And even without reverification, bank officials testified that they had decided by August 2008 to deny the application, establishing that the bank had everything needed for a decision.

Though the bank contends that it needed reverification, its internal documents characterized the submission in September 2009 as a "new application" because the bank had already denied the first application. Appellants' App'x at 695.

In sum, the bank had everything it needed by August 2008, so the Woodses' application for a take-out loan was complete by that time.

## III. The Bank's Other Arguments

Finally, the bank argues that regardless of whether it violated the Act with respect to the March 2008 application, the verdict form was ambiguous about which loan application was being addressed. According to the bank, the jury could have read the verdict form as referring to the Woodses' September 2009 application. And, as discussed above, the bank timely responded to the application submitted in September 2009. The bank contends that the Woodses bypassed any opportunity to object to the verdict form, precluding reversal.

I would reject this contention, for the problem with the verdict is unrelated to an ambiguity in the jury's findings; the problem is that the evidence overwhelmingly showed that the bank had failed to provide timely notice after deciding to deny the application for a take-out loan. The potential ambiguity of the questions posed to the jury would not have affected the predominance of evidence creating liability. Thus, the Woodses are entitled to a new trial regardless of whether they had objected to the verdict form.

* * *

In my view, the verdict conflicted with the great weight of the evidence. The undisputed evidence showed that

- the Woodses had applied for a take-out loan in March 2008,

13

- bank officials had decided in August 2008 to take adverse action on that application,

- the application had been complete at the time of the adverse action, and

- the bank had not notified the Woodses of the adverse action within the statutory time-period.

Therefore, the bank's actions created liability under the Equal Credit Opportunity Act. And as noted above, the ambiguity in the verdict form does not change this fact. As a result, I believe that the district court erred in denying the Woodses' motion for a new trial. In these circumstances, I respectfully dissent from the majority's conclusion in Part II(A).